PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HENRY PASHBY; ANNIE BAXLEY;
MARGARET DREW; DEBORAH FORD;
MELISSA GABIJAN; MICHAEL
HUTTER; JAMES MOORE; LUCRETIA
MOORE; AYLEAH PHILLIPS; ALICE
SHROPSHIRE; SANDY SPLAWN;
ROBERT JONES; REBECCA PETTIGREW,

        *Plaintiffs-Appellees,*

     and

BETTY MOORE,

        *Plaintiff,*

     v.

ALBERT DELIA, In his official
capacity as Secretary of the N.C.
Department of Health and Human
Services,

        *Defendant-Appellant.*

No. 11-2363

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:11-cv-00273-BO)

Argued: September 18, 2012

Decided: March 5, 2013

Before AGEE, WYNN, and FLOYD, Circuit Judges.

Remanded by published opinion. Judge Floyd wrote the majority opinion, in which Judge Wynn joined. Judge Agee wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Tracy J. Hayes, NORTH CAROLINA DEPART-MENT OF JUSTICE, Raleigh, North Carolina, for Appellant. Sarah Somers, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, for Appellees. **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Lisa Granberry Corbett, Special Deputy Attorney General, NORTH CARO-LINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellant. Douglas Stuart Sea, LEGAL SERVICES OF SOUTHERN PIEDMONT, INC., Charlotte, North Carolina; Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina; John R. Rittelmeyer, Jennifer L. Bills, Elizabeth D. Edwards, DISABILITY RIGHTS NC, Raleigh, North Carolina, for Appellees.

---

## OPINION

FLOYD, Circuit Judge:

In 2010, the North Carolina General Assembly voted to impose stricter eligibility requirements for in-home personal care services (PCS), an optional Medicaid program that assists disabled adults with daily tasks such as eating and bathing. Appellees—thirteen North Carolina residents who lost access to in-home PCS due to the statutory change (collectively "the PCS Recipients")—brought suit, contending that the new PCS program violated the Social Security Act, the Americans with Disabilities Act (ADA), and the Rehabilitation Act. The PCS Recipients further alleged that the boiler-

plate termination letters they received did not fulfill the Fourteenth Amendment's due process requirements.

The district court granted the PCS Recipients' motions for a preliminary injunction and class certification, and Appellant—Acting Secretary of the North Carolina Department of Health and Human Services (DHHS) Albert Delia—filed this timely appeal. On appeal, the DHHS argues that (1) the district court lacked subject matter jurisdiction; (2) the district court erred in granting the PCS Recipients' motion for class certification; (3) the injunction qualifies as a mandatory preliminary injunction, necessitating a heightened standard of review; (4) the PCS Recipients failed to make the case for a preliminary injunction; and (5) the district court's order does not satisfy Rule 65 of the Federal Rules of Civil Procedure. We agree with the district court's conclusion that a preliminary injunction was appropriate in this case. However, because the district court's order failed to comply with Rule 65, we remand.

I.

A.

Medicaid is a cooperative program through which the federal government offers financial assistance to states, allowing them to provide medical services to individuals with limited incomes. 42 U.S.C. § 1396-1. If a state participates in Medicaid, it must comply with federally mandated standards. *Id.* § 1396a. States may also choose to provide additional, optional benefits. North Carolina has elected to participate in Medicaid, and the DHHS administers its program.

One of the optional Medicaid benefits that North Carolina offers is PCS. Individuals who qualify for PCS are assigned an aide who assists them with everyday tasks. Prior to June 2011, Medicaid-eligible adults could receive PCS in their homes if a physician determined that they required medically

necessary assistance with two or more of the following five activities of daily living (ADLs): eating, bathing, dressing, mobility, and toileting. The North Carolina General Assembly began the process of altering these requirements when it passed Session Law 2010-31, which replaced the old in-home PCS program with the new In-Home Care for Adults (IHCA) program. The DHHS developed a plan for providing PCS under IHCA and sought approval from the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers Medicaid. The CMS approved the DHHS's plan through a "state plan amendment" (SPA) on April 15, 2011, and IHCA went into effect on June 1, 2011.

As part of the implementation process for IHCA, the DHHS developed IHCA Policy 3E, which is the focal point of this case. IHCA Policy 3E imposes stricter eligibility requirements for receiving in-home PCS. Pursuant to IHCA Policy 3E, adults qualify for in-home PCS if they require limited assistance with three ADLs or extensive assistance with two ADLs. As under the prior in-home PCS program, the recipient's physician must attest that in-home PCS is medically necessary, and a representative of the DHHS's Division of Medical Assistance (DMA) must conduct a face-to-face assessment before an individual can receive in-home PCS. Under both programs, the DMA's representative can reassess whether an individual qualifies for in-home PCS at any time.

In addition to offering in-home PCS, North Carolina also provides Medicaid-funded PCS to individuals who reside in adult care homes (ACHs). The eligibility requirements for receiving PCS in an ACH are less stringent than the requirements for obtaining in-home PCS under IHCA Policy 3E. Whereas an individual must need assistance with two or three of five ADLs before the DMA will approve in-home PCS under IHCA Policy 3E, individuals residing in ACHs qualify for PCS if they require "assistance" or "limited supervision" with regard to one of seven ADLs: bathing, dressing, personal hygiene, ambulation or locomotion, transferring, toileting, and

eating. An individual's personal care needs must be "medically related" to qualify for ACH PCS, but an ACH staff member rather than a DMA representative may conduct the assessment. Consequently, individuals who do not meet the requirements for in-home PCS may be able to receive PCS if they move to an ACH.

The CMS-approved SPA that authorized the DHHS to implement IHCA also required the DHHS to impose stricter eligibility requirements for ACH PCS. Specifically, pursuant to that SPA, ACH residents could qualify for PCS if they required assistance with two of seven ADLs. On May 1, 2012, the CMS approved a second SPA, reiterating that the DHHS must make its ACH PCS eligibility criteria comparable with its in-home PCS eligibility requirements and extending its deadline to do so until December 31, 2012. The North Carolina General Assembly took preliminary steps to assuage the CMS's concerns when it passed Session Law 2012-142, which specifies that Medicaid recipients must satisfy the same requirements to receive PCS regardless of whether they reside at home or in an ACH. These new eligibility criteria were scheduled to go into effect on January 1, 2013. The DHHS ultimately aims to provide all PCS—both in homes and in ACHs—under § 1915(i) of the Social Security Act. Because § 1915(i) allows a waiver of Medicaid's comparability requirements, the DHHS claims that the transition to § 1915(i) will eliminate any comparability issues with respect to PCS.

## B.

Before IHCA Policy 3E went into effect, the DHHS mailed letters informing approximately 2,405 individuals—including the named Appellees and certified class members—that they no longer met the eligibility requirements for in-home PCS and would cease to receive the service as of June 1, 2011. The letters did not give individualized reasons why each person's PCS had been terminated; instead, the letters cited North Carolina's shift to the new IHCA program as the reason for the

change in benefits. However, the letters did explain the administrative appeal process and advised the recipients of their right to review Medicaid's files regarding their cases. Many of the individuals who received these notifications—including Appellees Ayleah Phillips and Rebecca Pettigrew—continue to receive in-home PCS pending the resolution of their administrative appeals, and the DHHS reversed its decision with respect to Appellees Henry Pashby, Annie Baxley, Margaret Drew, Deborah Ford, Melissa Gabijan, Michael Hutter, James Moore, Lucretia Moore, Alice Shropshire, and Sandy Splawn after they filed this lawsuit. Appellee Robert Jones voluntarily dismissed his administrative appeal when a mediator refused to reinstate his in-home PCS.

The PCS Recipients brought suit on May 31, 2011, challenging IHCA Policy 3E and seeking a preliminary injunction to prohibit the DHHS from implementing stricter eligibility requirements for in-home PCS. Specifically, the PCS Recipients contended that the differences between the new in-home PCS program and the PCS available to individuals who reside in ACHs cause IHCA Policy 3E to contravene the ADA, section 504 of the Rehabilitation Act, and the Social Security Act. The PCS Recipients further alleged that the DHHS did not provide sufficient notice before terminating their in-home PCS, violating the Due Process Clause of the Fourteenth Amendment.

The PCS Recipients filed a motion for class certification on June 6, 2011. On December 8, 2011, the district court entered an order granting the PCS Recipients' motion for a preliminary injunction, thereby halting the implementation of IHCA Policy 3E. *Pashby v. Cansler*, 279 F.R.D. 347, 356 (E.D.N.C. 2011). The district court also granted the PCS Recipients' motion for class certification and defined the class as follows:

> [A]ll current or future North Carolina Medicaid recipients age 21 or older who have, or will have,

coverage of PCS denied, delayed, interrupted, terminated, or reduced by Defendant directly or through his agents or assigns as a result of the new eligibility requirements for in-home PCS and unlawful policies contained in IHCA Policy 3E.

*Id.* The DHHS now appeals both the district court's decision to certify the class and its decision to grant the preliminary injunction.

## II.

The DHHS first contends that this Court lacks subject matter jurisdiction over the PCS Recipients' claims. Specifically, the DHHS argues that this controversy is moot, that it is not ripe for review, and that the district court should have dismissed the PCS Recipients' claims and required them to proceed against the CMS under the Administrative Procedure Act (APA). As discussed below, the DHHS's contentions lack merit, and the district court possessed subject matter jurisdiction over the PCS Recipients' claims.

## A.

Standing is determined at the commencement of a lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.5 (1992). However, even if a plaintiff has standing when he or she files a complaint, subsequent events can moot the claim. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011). A case becomes moot, and thus deprives federal courts of subject matter jurisdiction, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)) (internal quotation marks omitted). When the case is a class action lawsuit, the named class representatives "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they

belong." *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)) (internal quotation marks omitted). If the named plaintiff's claim is a live controversy at the time of class certification, the case will not become moot even if the named plaintiff's personal claim later expires. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398-99 (1980).

The DHHS alleges that this case is moot for two reasons. First, the DHHS points out that many of the PCS Recipients dismissed their administrative appeals prior to class certification because mediators reversed the DHHS's decision to terminate their in-home PCS. The DHHS contends that this reinstatement of PCS mooted these PCS Recipients' claims. However, mootness does not result from a defendant's voluntary cessation of his allegedly illegal conduct unless it is clear that the behavior is unlikely to recur. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1982). In this case, the DHHS voluntarily reinstated in-home PCS for ten PCS Recipients, so their claims are not moot unless the DHHS is unlikely to repeat its allegedly illegal conduct. The DMA remains free to reassess the PCS Recipients' needs and cancel their PCS under IHCA Policy 3E at any time. Consequently, it is possible that the DMA will once again terminate their in-home PCS. Although the DHHS correctly contends that North Carolina has always reassessed in-home PCS recipients and that the risk of termination is not unique to IHCA Policy 3E, the DHHS overlooks an important distinction: the PCS Recipients do not challenge the practice of reassessment in general but rather take issue with IHCA Policy 3E's eligibility criteria. Because the DHHS voluntarily reinstated certain PCS Recipients' in-home PCS and could reassess them under IHCA Policy 3E, the fact that those PCS Recipients dismissed their administrative appeals does not moot their claims.

Second, the DHHS argues that the parties lack a "legally cognizable interest" in the outcome of this case because any

comparability issues will disappear when North Carolina's § 1915(i) waiver takes effect. However, the most recent SPA allows North Carolina to continue the current PCS program until December 31, 2012, and the DHHS has not completed its transition to the § 1915(i) program. The fact that North Carolina plans to replace the current Medicaid program in the future does not prevent this case from presenting a live controversy. Notably, the DHHS could delay or abandon its implementation of the § 1915(i) program, leaving IHCA Policy 3E as North Carolina's in-home PCS program for the foreseeable future. For these reasons, the PCS Recipients' claims are not moot.

## B.

A plaintiff also lacks standing if his claim is not ripe. The ripeness doctrine aims to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). For a claim to be ripe, "it must involve 'an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties.'" *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997) (alteration in original) (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)). The DHHS interprets this language to mean that the two PCS Recipients who have not completed the administrative appeals process lack standing because their claims are not ripe. However, as the district court correctly noted, the PCS Recipients are not challenging the outcome of the individual administrative appeals; they instead contest the DHHS's decision to implement IHCA Policy 3E, which is certainly a formalized administrative decision with concrete effects. Consequently, the PCS Recipients' claims satisfy the ripeness requirement.

## C.

Finally, the DHHS contends that we should dismiss the PCS Recipients' Social Security Act claims and require them to proceed against the CMS under the APA. To support this argument, the DHHS cites the Supreme Court's recent decision in *Douglas v. Independent Living Center of Southern California, Inc.*, 132 S. Ct. 1204 (2012). In *Independent Living*, the Supreme Court considered whether the respondents should seek review under the APA because the CMS had approved the California statute at issue during the pendency of the lawsuit. *Id.* at 1209-11. However, the Medicaid beneficiaries who brought suit in *Independent Living* challenged the SPA itself rather than a program related to the SPA, such as IHCA Policy 3E. *Id.* at 1209. Furthermore, in *Independent Living*, the CMS had determined that the changes at issue complied with federal law, *id.* at 1210, whereas here the CMS found that North Carolina's in-home PCS program violates Medicaid's comparability requirements. Finally, the Supreme Court did not hold that the plaintiffs in *Independent Living* had to proceed under the APA; instead, it remanded the case to the Ninth Circuit to allow it to make that determination. *Id.* at 1210-11. In light of *Independent Living*'s holding and the distinctions between its facts and the facts of this case, there was no need for the district court to require the PCS Recipients to seek review pursuant to the APA.

## III.

Next, the DHHS contends that the district court erred in granting the PCS Recipients' motion for class certification. Rule 23(f) of the Federal Rules of Civil Procedure allows a party to seek a permissive interlocutory appeal from an order granting class certification. Pursuant to this rule, an appellant must file a petition to appeal within fourteen days after the district court enters its order regarding class certification. Fed. R. Civ. P. 23(f). The petition must include: (1) the question presented, (2) the facts necessary to understand the question

presented, (3) the relief sought, (4) the rule or statute that authorizes the appeal and the reasons the Court should allow it, and (5) a copy of the order. Fed. R. App. P. 5(b). The DHHS does not dispute that it failed to appeal the district court's class certification decision pursuant to Rule 23(f).

Rule 23(f) is not the only method by which parties can challenge a district court's class certification order. In *Allstate Insurance Co. v. McNeill*, 382 F.2d 84 (4th Cir. 1967), this Court explained that "an appeal from an order granting or refusing an injunction brings before the appellate court the entire order, not merely the propriety of injunctive relief." *Id.* at 88 (quoting Charles A. Wright, *Federal Courts* (1st ed. 1963)). Therefore, when this Court entertains an appeal pursuant to 28 U.S.C. § 1292(a)(1)—which grants the courts of appeals' jurisdiction over interlocutory orders regarding injunctions—it "may and should resolve all other questions adjudicated by the [district court's] decree." *Id.* at 87. The DHHS contends that *Allstate*'s holding authorizes us to review the district court's class certification order despite the DHHS's failure to comply with Rule 23(f).

Other circuits have refused to review class certification decisions pursuant to § 1292(a)(1) unless the class certification issue is "inextricably bound up with the injunction." *FDIC v. Bell*, 106 F.3d 258, 262 (8th Cir. 1997) (quoting *Fogie v. THORN Ams., Inc.*, 95 F.3d 645 (8th Cir. 1996)); *see also Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1124 (7th Cir. 1983) ("Cases applying § 1292(a)(1) have held that other incidental orders or issues nonappealable in and of themselves but in fact interdependent with the order granting or denying an injunction may also be reviewed, but only to the extent that they bear upon and are central to the grant or denial of the injunction."); *Kershner v. Mazurkiewicz*, 670 F.2d 440, 448-49 (3d Cir. 1982) ("[A] pendent class certification order is not appealable under section 1292(a)(1) unless the preliminary injunction issue cannot properly be decided without reference to the class certification question."); *Payne v. Travenol Labs.,*

*Inc.*, 673 F.2d 798, 808-09 (5th Cir. 1982) (holding that the Fifth Circuit could review the district court's class certification decision because the "questions concerning class certification . . . [were] directly tied to the partial denial of an injunction"). Even the *Allstate* Court specified that it could consider pendent issues pursuant to § 1292(a)(1) only because those issues were "basic to the injunction." *Allstate Ins. Co.*, 382 F.2d at 87. Consequently, for this Court to review the district court's class certification decision, class certification must be closely connected to the preliminary injunction.

The DHHS argues that class certification is intertwined with the propriety of injunctive relief for two reasons. First, the DHHS contends that the PCS Recipients lack standing to bring this lawsuit and must rely upon the class members to remedy this defect. As discussed above, this argument lacks merit because the PCS Recipients have standing. Second, the DHHS alleges that the district court took the class members into account when determining whether IHCA Policy 3E caused irreparable harm. In support of this proposition, the DHHS points only to the district court's statement that the "[l]ack of in-home PCS could result in either serious physical or mental injury or forced entry into institutional settings for many of the named Plaintiffs and members of the class." However, this single reference to class members hardly makes the grant of class certification so connected to the injunction that this Court can consider the class certification issue pursuant to § 1292(a)(1). Notably, as discussed below, the district court could have determined that IHCA Policy 3E caused irreparable harm by looking only at its effect on the named Appellees and omitting any reference to the class members. Accordingly, because the class certification question is distinct from the preliminary injunction, the issue is not properly before us.

IV.

The DHHS next contends that this Court should apply a heightened standard of review when evaluating the prelimi-

nary injunction in this case because it qualifies as a mandatory preliminary injunction rather than a traditional, prohibitory preliminary injunction. We evaluate a district court's decision to grant preliminary injunctions under an abuse of discretion standard. *Aggaro v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012). Pursuant to this standard, we review the district court's factual findings for clear error and review its legal conclusions de novo. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). The district court must exercise its discretion "within the applicable rules of law or equity." *Direx Isr., Ltd. v. Breakthrough Med Corp.*, 952 F.2d 802, 814 (4th Cir. 1992). Because preliminary injunctions are "extraordinary remed[ies] involving the exercise of very far-reaching power," *id.* at 811, this Court should be particularly "exacting" in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction. *Sun Microsystems, Inc. v. Microsoft Corp.* (*In re Microsoft Corp. Antitrust Litig.*), 333 F.3d 517, 524 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). Furthermore, when the preliminary injunction is "mandatory rather than prohibitory in nature," this Court's "application of this exacting standard of review is even more searching." *Id.* at 525.

Prohibitory preliminary injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending. *Sun Microsystems*, 333 F.3d at 525 ("The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."). Citing a case from the Tenth Circuit, the DHHS contends that whether the injunction preserves the status quo is not the determinative factor in categorizing it as prohibitory or mandatory. The DHHS bases this argument on the Tenth Circuit's identification of three types of preliminary injunctions that necessitate a heightened standard: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary

injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam). Other than a favorable reference in an unpublished opinion to the case from which the Tenth Circuit drew this standard, *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991), this Court has not adopted this three-part definition. *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232 (4th Cir. 1992) (unpublished table decision). Instead, this Court has held that a preliminary injunction's tendency to preserve the status quo determines whether it is prohibitory or mandatory. *E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) ("Mandatory preliminary injunctions do not preserve the status quo. . . ."). Consequently, to determine whether we should apply a heightened standard of review in this case, we must ascertain whether the injunction maintains the status quo.

This Court has defined the status quo as the "last uncontested status between the parties which preceded the controversy." *Aggaro*, 675 F.3d at 378 (quoting *Stemple v. Bd. of Educ.*, 623 F.2d 893, 898 (4th Cir. 1980)) (internal quotation marks omitted). The DHHS contends that the last uncontested status was the North Carolina General Assembly and the CMS authorizing it to implement stricter eligibility criteria for in-home PCS. In support of this argument, the DHHS points out that the first SPA had been in effect for over seven months when the district court heard oral arguments regarding the preliminary injunction on November 17, 2011, and the DHHS had prepared to implement this SPA for over a year before IHCA Policy 3E took effect on June 1, 2011. However, the DHHS ignores the fact that the PCS Recipients were unaware that IHCA Policy 3E had resulted in the termination of their in-home PCS until mid-May 2011, approximately two weeks before they filed their motion for a preliminary injunction on May 31, 2011. In sum, the DHHS appears to contend that the

delays inherent in the judicial system somehow altered the status quo to the PCS Recipients' detriment.

When the PCS Recipients filed their motion for a preliminary injunction, IHCA Policy 3E had not taken effect. Therefore, the last uncontested status between the parties was the pre-IHCA Policy 3E regime, under which the PCS Recipients were able to receive in-home PCS. The district court's order "prohibited [the DHHS] from implementing IHCA Policy 3E," thereby maintaining this status quo. *Pashby*, 279 F.R.D. at 356. Because it preserved the status quo, the injunction is prohibitory rather than mandatory, and the heightened standard of review does not apply.

## V.

Next, we consider whether the district court erred in granting the PCS Recipients' request for a preliminary injunction. The Supreme Court established the standard for imposing a preliminary injunction in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). That case requires parties seeking preliminary injunctions to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Id.* at 20. Before the Supreme Court issued its ruling in *Winter*, this Court used a "balance-of-hardship test" that allowed it to disregard some of the preliminary injunction factors if it found that the facts satisfied other factors. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977). However, in light of *Winter*, this Court recalibrated that test, requiring that each preliminary injunction factor be "satisfied as articulated." *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, *Citizens United v. FEC*, 130 S. Ct. 876 (2010), *aff'd*, *The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam). Accordingly,

courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor.

### A.

First, plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits. *Winter*, 555 U.S. at 20. Although this inquiry requires plaintiffs seeking injunctions to make a "clear showing" that they are likely to succeed at trial, *Real Truth*, 575 F.3d at 345, plaintiffs need not show a certainty of success, *see* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2948.3 (2d ed. 1995). The PCS Recipients make the following merits-based arguments in this case: (1) IHCA Policy 3E violates the ADA and section 501 of the Rehabilitation Act because it is easier to qualify for ACH PCS than it is to qualify for in-home PCS, which effectively relegates individuals who require PCS to ACHs; (2) IHCA Policy 3E violates the Social Security Act's comparability requirement by treating individuals differently even though they have the same level of need; and (3) the termination notices that the PCS Recipients received did not comport with the requirements of due process. For the reasons that follow, the district court did not abuse its discretion in finding that the PCS Recipients demonstrated a likelihood of success on the merits of their ADA, Rehabilitation Act, and Social Security Act claims. However, we conclude that the district court erred in determining that the PCS Recipients are likely to succeed on the merits of their due process claim.

### *ADA and Rehabilitation Act Claims*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although the ADA "does not require a public entity to provide to individuals with disabilities . . . services of a

personal nature including assistance in eating, toileting, or dressing," 28 C.F.R. § 35.135, a state that decides to provide these services must do so "in the most integrated setting appropriate to the needs of qualified individuals with disabilities," *id.* § 35.130(d). Pursuant to federal regulations, the "most integrated settings" are those that "enable[] individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B. In addition to arguing that IHCA Policy 3E violates Title II of the ADA, the PCS Recipients also allege that IHCA Policy 3E violates section 504 of the Rehabilitation Act. We consider their Title II and section 504 claims together because these provisions impose the same integration requirements. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

The Supreme Court addressed Title II's requirements in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court held that "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Id.* at 600. The DHHS forcefully argues that the PCS Recipients are unlikely to succeed on the merits under *Olmstead* because Policy 3E has not resulted in the actual institutionalization of any former in-home PCS recipients; instead, they merely face a risk of institutionalization. However, decisions from both the United States Department of Justice (DOJ) and the Tenth Circuit have refuted this argument.

Because Congress instructed the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's determination that "the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." U.S. Dept. of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.*, http://www.ada.gov/olmstead/q&a_olmstead.htm (last updated June 22, 2011); *see also Olmstead*, 527 U.S. at 597-98 ("Because

the Department is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect." (citation omitted)). Moreover, the Tenth Circuit has held that "there is nothing in the plain language of the regulations that limits protection to persons who are currently institutionalized." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). In sum, individuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise successful Title II and Rehabilitation Act claims because they face a risk of institutionalization.

As a preliminary matter, we note that the district court did not explain the reasoning behind its determination that the PCS Recipients are "at risk of segregation, in the form of institutionalization, as a result of . . . Policy 3E." *Pashby*, 279 F.R.D. at 355. However, it is well-settled that we "review judgments, not opinions," which allows us to "affirm the district court on any ground that would support the judgment in favor of the party prevailing below." *Everett v. Pitt Cnty. Bd. of Educ.*, 678 F.3d 281, 291 (4th Cir. 2012) (quoting *Crosby v. City of Gastonia*, 635 F.3d 634, 643 n.10 (4th Cir. 2011)) (internal quotation marks omitted); *see also Cochran v. Morris*, 73 F.3d 1310, 1315 (4th Cir. 1996) (en banc) (noting the "well-recognized authority of courts of appeals to uphold judgments of district courts on alternate grounds"). We may therefore affirm the district court's conclusion that IHCA Policy 3E places the PCS Recipients at risk of institutionalization as long as the record supports this conclusion.

Eleven of the PCS Recipients and individuals familiar with the remaining two PCS Recipients' needs made declarations regarding the PCS Recipients' in-home care requirements. These declarants stated that the PCS Recipients could not live on their own without in-home PCS or that it would be unsafe for them to do so. Each of these declarants also attested that the PCS Recipients had no friends or family members who could offer the same amount of care that their aides provided under the in-home PCS program. Finally, the declarations

indicate that all but two of the PCS Recipients "may," "might," "probably" would, or were "likely" to enter an ACH facility due to the termination of their in-home PCS. Appellee Michael Hutter specifically stated that he "will have no choice but to enter a facility" if the DHHS fails to reinstate his in-home PCS. These declarations demonstrate that the PCS Recipients face a significant risk of institutionalization due to the termination of their in-home PCS under IHCA Policy 3E.

The DHHS also alleges that, even if *Olmstead* allows claims premised on a risk of institutionalization, ACHs are not institutions. The district court assumed without discussion that residing in an ACH qualifies as "institutionalization," *Pashby*, 279 F.R.D. at 355, and we find that the record supports this conclusion. After conducting an investigation of whether North Carolina's ACHs violated *Olmstead*'s integration requirement, the DOJ concluded in a July 28, 2011, letter that "[a]dult care homes are institutional settings that segregate residents from the community and impede residents' interactions with people who do not have disabilities." The DHHS, in turn, submitted the declarations of ACH employees who dispute the DOJ study's findings. The only declaration that specifically contests the DOJ's determination that ACHs are institutions points to section 131D-21 of the General Statutes of North Carolina, which lays out an "Adult Care Home Residents' Bill of Rights." The declaration implies that ACHs cannot qualify as institutions because institutions would not allow residents the level of autonomy that this statutory provision guarantees. In relevant part, the Adult Care Home Residents' Bill of Rights safeguards ACH residents' right "[t]o associate and communicate privately and without restriction with people and groups of [their] own choice," their rights to send and receive mail and use the telephone, and their right to "participate by choice in accessible community activities and in social, political, medical, and religious resources." N.C. Gen. Stat. § 131D-21(8)-(10), (15). Although these rights demonstrate North Carolina's goal of providing ACH residents with certain freedoms, goals often fall short of real-

ity. We therefore hold that the district court did not abuse its discretion when it concluded that North Carolina's ACHs were institutions.

Finally, the DHHS argues that, even if *Olmstead* allows claims based on a risk of institutionalization and ACHs qualify as institutions, the PCS Recipients still cannot succeed on the merits of their ADA claim because modifying the PCS program to avoid discrimination would "fundamentally alter" the service. Pursuant to 28 C.F.R. § 35.130(b)(7), "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." The DHHS essentially argues that continuing to offer in-home PCS to the class members and named Appellees constitutes a fundamental alteration due to the administrative and financial burdens it entails.

Contrary to the DHHS's assertions, "budgetary concerns do not alone sustain a fundamental alteration defense." *M.R. v. Dreyfus*, 663 F.3d 1100, 1118 (9th Cir. 2011), *amended by* No. 11-35026, 2012 WL 2218824 (9th Cir. June 18, 2012); *see also Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005) ("Though clearly relevant, budgetary constraints alone are insufficient to establish a fundamental alteration defense."); *Fisher*, 335 F.3d at 1183 ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."). Although the First Circuit has held that "in no event is the [government] required to undertake measures that would impose an undue financial or administrative burden . . . or effect a fundamental alteration in the nature of the service," the court drew this standard from a Supreme Court opinion interpreting 28 C.F.R. § 35.150(a)(3), which specifically mentions "undue financial and administrative burdens." *Toledo v.*

*Sanchez*, 454 F.3d 24, 39 (1st Cir. 2006) (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)) (internal quotation marks omitted). We join the Third, Ninth, and Tenth Circuits in holding that, although budgetary concerns are relevant to the fundamental alteration calculus, financial constraints alone cannot sustain a fundamental alteration defense. Because the PCS Recipients face a significant risk of institutionalization, because North Carolina's ACHs are institutions, and because the DHHS has failed to make out a successful fundamental alteration defense, the district court did not abuse its discretion in holding that the PCS Recipients are likely to succeed on the merits of their ADA and Rehabilitation Act claims.

## Social Security Act Claim

Next, the DHHS argues that the district court abused its discretion in holding that the PCS Recipients were likely to succeed on the merits of their Social Security Act claim for two reasons. Under the Social Security Act, individuals with comparable medical needs must receive comparable medical assistance. 42 U.S.C. § 1396a(a)(10)(B). First, the DHHS contends that the CMS's determination that the SPA complied with the Social Security Act is entitled to *Chevron* deference. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). However, regardless of whether the CMS found that the SPA complied with the Social Security Act, it never determined that IHCA Policy 3E alone did so.[1] Instead, the CMS approved a SPA that imposed stricter eligibility requirements for both in-home PCS and ACH PCS, so any finding regarding the SPA's legality was dependent upon the

---

[1]The record demonstrates that, although the CMS approved the plan that became IHCA Policy 3E, it never approved IHCA Policy 3E itself. Furthermore, the CMS never approved the plan that became IHCA Policy 3E without also approving stricter qualification criteria for ACH PCS. We believe that the district court was referring to the plan that became IHCA Policy 3E when it found that "CMS approved Policy 3E . . . while simultaneously approving stricter criteria for ACH PCS." *See Pashby*, 279 F.R.D. at 354.

DHHS altering its ACH PCS program. We therefore decline to address the DHHS's argument that the CMS's approval of the SPA is entitled to *Chevron* deference because the DHHS has not implemented the SPA's ACH PCS eligibility criteria.

Second, the DHHS contends that individuals living in ACHs and individuals receiving in-home PCS do not have comparable medical needs because the "needs and service requirements of the two populations are necessarily different." To support its argument, the DHHS alleges that a physician must certify that an individual cannot live safely at home before the individual may live in an ACH. However, this contention is simply inaccurate. The North Carolina Administrative Code provides that

> [a]ny adult (18 years of age or over) who, because of a temporary or chronic physical condition or mental disability, needs a substitute home may be admitted to an adult care home when, *in the opinion of the resident, physician, family or social worker, and the administrator* the services and accommodations of the home will meet his particular needs.

*See* 10A N.C. Admin. Code 13F.0701. As the emphasized language indicates, an individual may gain admission to an ACH based on his or her own opinion or the opinions of individuals with no medical background. Furthermore, the fact that one of these individuals must believe that the potential ACH resident "needs a substitute home" before he or she may move to an ACH is not necessarily in tension with the rule that in-home PCS recipients must "[n]ot require monitoring, supervision, or ongoing care from a licensed care professional"; "a resident, physician, family or social worker, and the administrator" could believe that an individual "needs a substitute home" for any number of reasons. Finally, both in-home PCS recipients and ACH PCS recipients must demonstrate that family members or friends cannot provide the assistance that they need, which prevents the DHHS from pointing

to this requirement as a basis to distinguish the medical needs of in-home PCS and ACH PCS recipients. The DHHS therefore has no basis for arguing that ACH residents and in-home PCS recipients necessarily have incomparable medical needs.

Under IHCA Policy 3E, an individual who requires limited, medically necessary assistance with eating and bathing could receive PCS in an ACH, but the same individual could not receive in-home PCS. These individuals' needs are not just comparable; they are identical. Because individuals with comparable medical needs do not receive comparable medical care under IHCA Policy 3E, the district court did not abuse its discretion in finding that the PCS Recipients are likely to succeed on their comparability claim.

In addition to mandating comparability, the Social Security Act also requires government entities to use reasonable standards for determining eligibility for Medicaid programs. 42 U.S.C. § 1396a(a)(17). The DHHS argues extensively that the PCS Recipients cannot succeed on their "reasonableness" claim because they seek to enforce the provision under the Supremacy Clause. However, in light of our determination that the PCS Recipients are likely to succeed on the merits of their ADA, Rehabilitation Act, and comparability claims, we need not address their reasonableness claim.

*Due Process Claim*

Finally, the DHHS contends that the PCS Recipients are unlikely to succeed on the merits of their due process claim. The PCS Recipients contend that the DHHS[2] failed to satisfy

---

[2]Although we refer to the DHHS as the author of the termination letters for purposes of this opinion, the Carolinas Center for Medical Excellence (CCME)—a DMA-affiliated contractor—was responsible for informing individuals that they no longer qualified for in-home PCS. The letters appear on CCME letterhead and bear the signature of the CCME's "Independent Assessment Staff."

the Fourteenth Amendment's requirements because it used boilerplate letters that did not include individualized reasons for terminating the recipients' in-home PCS, preventing them from preparing for any post-termination hearings. Instead, the letters cite North Carolina's shift to the new IHCA program as the reason for the benefits termination. The DHHS argues that the letters did not prejudice the PCS Recipients because they were able to file appeals and could have resolved any informational defects by requesting copies of their Medicaid files. For the reasons we outline below, we agree with the DHHS's contention that the letters comport with due process's requirements.

The CMS has promulgated regulations that set out the requirements for informing Medicaid recipients of a reduction or termination of benefits. Those regulations state that, "[a]t the time of any action affecting [a Medicaid recipient's] claim," 42 C.F.R. § 431.206(c)(2), the state agency must inform each beneficiary in writing "[o]f his right to a hearing," "[o]f the method by which he may obtain a hearing," and "[t]hat he may represent himself or use legal counsel, a relative, a friend, or other spokesman," *id.* § 431.206(b). The written notice must also contain:

> (a) A statement of what action the State, skilled nursing facility, or nursing facility intends to take;

> (b) The reasons for the intended action;

> (c) The specific regulations that support, or the change in Federal or State law that requires, the action;

> (d) An explanation of—

>> (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or

(2)   In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

*Id.* § 431.210. However, this regulatory provision does not specifically require individualized reasons for the government's decision. *See Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005) (holding that Medicaid termination notices did not violate 42 C.F.R. § 431.210 or due process when they did not include "specific, individualized reasons supporting the agency's conclusions").

A review of the notices at issue in this case reveals that they include information regarding the recipient's "right to a hearing," "the method by which he may obtain a hearing," and "[t]hat he may represent himself or use legal counsel." 42 C.F.R. § 431.206(b). The notices state: "YOU HAVE THE RIGHT TO APPEAL THIS DECISION," "[t]o file for a hearing you must submit a completed hearing request form (enclosed . . . in the recipient's mailing)," and "[y]ou may represent yourself in the hearing process, hire an attorney or use a legal aid attorney, or ask a relative, friend, or other spokesperson (e.g. case manager) to speak for you."

The notices also clearly contain "[a] statement of what action the State . . . intends to take," the "reasons for the intended action," and identify the change in North Carolina law that requires the action, 42 C.F.R. § 431.210(a)–(c):

> Effective June 1, 2011, N.C. Medicaid will no longer offer services under the Personal Care Services (PCS) and PCS-Plus programs. New In-Home Care (IHC) programs will be implemented effective June 1, 2011. The Carolinas Center for Medical Excel-

lence (CCME) conducts independent assessments and makes prior approval decisions for IHC services in the N.C. Medicaid program.

CCME has reviewed your eligibility for the new In-Home Care for Adults (IHCA) program. Medicaid did not approve this request to transfer to IHCA.

Medicaid did not approve the request to transfer to IHCA because your assessed activities of daily living do not meet the minimum IHCA program requirements of hands-on assistance for unmet needs with three qualifying activities of daily living, or with two qualifying activities of daily living, at least one of which requires extensive hands-on assistance.

Unless you appeal, your current authorized level of [care] will stop effective June 1, 2011.

The notices further explain in detail the recipients' right to appeal the decision. Among other things, the notices state that "[i]f you submit the request for a hearing within 30 days of the date of this letter . . . your service(s) will be reinstated during the appeal unless you choose not to maintain your service(s)."

The notices also include "[a]n explanation of . . . the circumstances under which a hearing will be granted" and "[a]n explanation of the circumstances under which Medicaid is continued if a hearing is requested," 42 C.F.R. § 431.210(d), (e):

To appeal, you must complete and file the attached Medicaid Recipient Services Hearing Request form asking for a hearing with the Office of Administrative Hearings. YOU HAVE 30 DAYS FROM THE DATE OF THIS LETTER TO FILE THE REQUEST FOR HEARING. . . .

> If you submit the request within 30 days of the date of this letter and as long as you remain otherwise eligible for the service, your service(s) will be reinstated during the appeal unless you choose not to maintain your service(s).

In sum, the notices comply with the requirements of the applicable regulations.[3] We therefore turn to the question of whether the notices satisfy the Fourteenth Amendment's strictures.

In *Atkins v. Parker*, 472 U.S. 115 (1985), the Supreme Court considered what requirements the Due Process Clause imposed under circumstances very similar to the case at hand. Specifically, the Court evaluated whether food stamp recipients had been deprived of due process when they received boilerplate notices informing them of a reduction or termination in benefits based on a change in federal law. *Id.* at 117. With respect to the termination of benefits, the notices distributed in *Atkins* stated only that

> RECENT CHANGES IN THE FOOD STAMP PROGRAM HAVE BEEN MADE IN ACCORDANCE WITH 1981 FEDERAL LAW. UNDER THIS LAW, THE EARNED INCOME DEDUCTION FOR FOOD STAMP BENEFITS HAS BEEN LOWERED FROM 20 TO 18 PERCENT. THIS REDUCTION MEANS THAT A HIGHER PORTION OF YOUR HOUSEHOLD'S EARNED

---

[3]The DHHS contends that the PCS Recipients cannot bring suit pursuant to 42 U.S.C. § 1396a(a)(3)—which requires states to provide a fair hearing to individuals whose claims for medical assistance are denied—because that provision does not create an enforceable right. However, because we hold that the notices satisfy the applicable regulatory requirements, we see no need to address the § 1396a(a)(3) issue. *See Doe, 1-13 ex rel. Doe Sr. No.'s 1-13 v. Bush*, 261 F.3d 1037, 1056 & n.18 (11th Cir. 2001) (interpreting § 1396a(a)(3) as incorporating the requirements of the applicable regulatory provisions).

INCOME WILL BE COUNTED IN DETERMIN-
ING YOUR ELIGIBILITY AND BENEFIT
AMOUNT FOR FOOD STAMPS. AS A RESULT
OF THIS FEDERAL CHANGE, YOUR BENEFITS
WILL EITHER BE REDUCED IF YOU REMAIN
ELIGIBLE OR YOUR BENEFITS WILL BE TER-
MINATED.

*Id.* at 120. These notices contained no specific or individual-
ized assessments but did include a single additional paragraph
stating that "YOU HAVE THE RIGHT TO REQUEST A
FAIR HEARING IF YOU DISAGREE WITH THIS
ACTION" and that, "IF YOU ARE REQUESTING A HEAR-
ING, YOUR FOOD STAMP BENEFITS WILL BE REIN-
STATED." *Id.* at 120–21.

Recipients of this notice contended the notice violated their
due process rights because it did not contain "an individual-
ized calculation" that the plaintiffs argued was necessary "to
avoid the risk of an erroneous reduction or termination." *Id.*
at 127. The Supreme Court disagreed, holding that the Due
Process Clause does not require the government to provide
individualized reasons in termination notices when the termi-
nation stems from a broad statutory change. *Id.* at 131 & n.35.
First, the Court considered whether the notice at issue "pro-
vided adequate protection against any deprivation based on an
unintended mistake." *Id.* at 128. The Court examined the
notice and concluded that the notice did, in fact, provide ade-
quate protections against mistakes because the "notice plainly
informed each household of the opportunity to request a fair
hearing and the right to have its benefit level frozen if a hear-
ing was requested." *Id.*

The Supreme Court next considered whether due process
"required a more detailed notice of the mass change" than
what the government had provided. *Id.* The Court stated that
the benefit terminations at issue did "not concern the proce-
dural fairness of individual eligibility determinations" but,

rather, "a legislatively mandated substantive change in the scope of the entire program." *Id.* at 129. In rejecting the argument that due process "required a more detailed notice," *id.* at 128, the Court held that "[t]he procedural component of the Due Process Clause does not 'impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits,'" *id.* at 129 (quoting *Richardson v. Belcher*, 404 U.S. 78, 81 (1971)). The Court continued that "[t]he legislative determination provides all the process that is due," *id.* at 130 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432-33 (1982)) (internal quotation marks omitted), and concluded that "[t]he claim that petitioners had a constitutional right to better notice of the consequences of the statutory amendment is without merit," *id.*

Like the benefits reductions at issue in *Atkins*, the benefits terminations associated with IHCA Policy 3E stemmed from a broad statutory change. *Id.* at 117. We recognize that the DHHS could have lowered the risk that it would erroneously deprive individuals of in-home PCS by including a single sentence summarizing the recipients' in-home PCS qualification information. However, the *Atkins* Court clearly stated that government actors sufficiently counteract this risk by informing recipients that they can request a hearing and that the government will reinstate their benefits during the pendency of that hearing. *Id.* at 128. In light of *Atkins*, we hold that the district court abused its discretion when it summarily determined that the PCS Recipients were likely to succeed on the merits of their due process claim.[4] However, because we find that

---

[4]The district court's analysis of the PCS Recipients' due process claim was limited to the following:

> Defendant's notice to all Plaintiffs contained verbatim language that failed to provide detailed reasons for the proposed termination. As the termination of in-home PCS could be quantified as a "brutal need," Defendant is likely required to go to greater lengths to provide more detailed notice regarding the reasons for the termination of an individual's benefits.

*Pashby*, 279 F.R.D. at 355.

they are likely to succeed on the merits of their ADA, Rehabilitation Act, and Social Security Act claims, our conclusion regarding their due process claim does not affect our *Winter* analysis.

## B.

Next, a party seeking a preliminary injunction must prove that he or she is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The DHHS contends that the PCS Recipients have failed to show irreparable harm because none of them proved that they were certain to suffer injury as a result of IHCA Policy 3E. However, as discussed below, this argument lacks merit.

In *M.R. v. Dreyfus*, the Ninth Circuit held that a reduction of PCS constituted irreparable harm, explaining that "beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care." 663 F.3d at 1114 (9th Cir. 2011) (quoting *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009)) (internal quotation marks omitted). As explained above, to qualify for in-home PCS under the pre-IHCA program, the recipient's physician had to attest that in-home PCS was medically necessary. Each of the PCS Recipients met this requirement, which indicates that they lost "needed medical care" when the DHHS terminated their in-home PCS. Consequently, even if—as the DHHS contends—the PCS Recipients' evidence of harm does not rise to the level of the evidence in *M.R. v. Dreyfus*, the district court did not abuse its discretion in finding that the PCS Recipients demonstrated irreparable harm.

## C.

To obtain a preliminary injunction, a plaintiff must also demonstrate that the balance of hardships tips in his or her favor. *Winter*, 555 U.S. at 20. The DHHS argues that the PCS

Recipients cannot satisfy this requirement because the injunction will force North Carolina to direct funds away from other state programs—including other Medicaid programs—to provide in-home PCS to the PCS Recipients. When faced with a similar situation, the Ninth Circuit affirmed a district court's decision to grant an injunction, explaining that California's financial problems did not outweigh the plaintiffs' health concerns even when the state's financial situation threatened to cause the end of other Medicaid services. *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1115 (9th Cir. 2010), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012). "[T]he State is free to exercise its 'considered judgment' and reduce [Medicaid benefits]. Yet it may not do so for purely budgetary reasons." *Id.* The balance of hardships tips the same way in this case. Accordingly, the district court did not abuse its discretion in finding that the harm that IHCA Policy 3E poses to the PCS Recipients' health outweighs the burden that the injunction places on North Carolina's budget.

### D.

As outlined above, the district court separately considered three of the *Winter* factors: likelihood of success on the merits, irreparable harm, and whether the balance of hardships tips in the PCS Recipients' favor. *Pashby*, 279 F.R.D. at 354-56. However, when evaluating the public interest prong, the district court found that the injunction was in the public interest because the PCS Recipients showed "a likelihood of success on the merits" and "the public interest always lies with upholding the law and having the mandates of the Medicaid Act, the ADA, the Rehabilitation Act, and due process enforced." *Id.* at 356. The district court gave no other reason for finding that the PCS Recipients had satisfied the public interest factor, despite *Winter*'s admonition that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-*

*Bacelo*, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted).

Although this Court's precedent does not address whether likelihood of success on the merits can singlehandedly satisfy the public interest factor when other considerations are at stake, our sister circuits' opinions offer some guidance on this point. For example, in *Apple, Inc. v. Samsung Electronics Co.*, the Federal Circuit held that "[a]lthough the public interest inquiry is not necessarily or always bound to the likelihood of success o[n] the merits, . . . absent any other relevant concerns . . . the public is best served by enforcing patents that are likely valid and infringed." 678 F.3d 1314, 1338 (Fed. Cir. 2012) (alterations in original) (quoting *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006)) (internal quotation marks omitted). Furthermore, in *Thalheimer v. City of San Diego*, the Ninth Circuit affirmed the district court's conclusion that the public's interest in "upholding free speech and association rights" satisfied *Winter*'s public interest prong. 645 F.3d 1109, 1128-29 (9th Cir. 2011); *Thalheimer v. City of San Diego*, 706 F. Supp. 2d 1065, 1086 (S.D. Cal. 2010). Although this policy interest certainly relates to the district court's conclusion that the plaintiffs were likely to succeed on the merits of their First Amendment claim, the district court considered other, competing interests before reaching its conclusion. *Thalheimer*, 706 F. Supp. 2d at 1086. In sum, the district court could find that the likelihood of success on the merits satisfied the public interest prong only if other considerations did not meaningfully weigh on that factor.

The parties in this case raised multiple public interest considerations that warranted the district court's attention, so considering only the likelihood of success on the merits was inappropriate. Specifically, the DHHS contends that the injunction is not in the public interest due to the financial effect it will have on other state programs, including North Carolina's other Medicaid programs. The district court con-

sidered this issue only when balancing the hardships. Further-
more, the PCS Recipients imply that the termination of their
in-home PCS will adversely affect the public interest because
it will have a detrimental impact on public health. Once again,
the district court discussed this consideration only when bal-
ancing the hardships. Because the district court failed to cor-
rectly apply the rule set forth in *Winter* and *Real Truth* when
it combined the likelihood of success and public interest fac-
tors, it applied an incorrect legal standard.

Although the district court misapplied *Winter*'s require-
ments, this error does not prohibit us from affirming the
court's judgment in favor of the PCS Recipients on this issue.
As discussed above, we may affirm the district court's judg-
ment based on any ground that appears in the record. Conse-
quently, we look to the record to determine whether to affirm
the district court's conclusion that the injunction promotes the
public interest.

In support of their contention that the injunction serves the
public interest, the PCS Recipients argue that IHCA Policy
3E's adverse effect on public health prevents the program
from furthering the public interest. The record shows that
each of the 2,405 individuals who lost access to in-home PCS
under IHCA Policy 3E had to demonstrate that the service
was medically necessary. The Ninth Circuit has explained that
"there is a robust public interest in safeguarding access to
health care for those eligible for Medicaid." *Indep. Living Ctr.
of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir.
2009), *vacated and remanded on other grounds*, 131 S. Ct.
1204 (2012). That court also held that "[s]tate budgetary con-
cerns cannot . . . be 'the conclusive factor in decisions regard-
ing Medicaid,'" *id.* (quoting *Ark. Med. Soc'y v. Reynolds*, 6
F.3d 519, 531 (8th Cir. 1993)), and we agree. Although we
understand that the North Carolina legislature must make dif-
ficult decisions in an imperfect fiscal climate, the public inter-
est in this case lies with safeguarding public health rather than
with assuaging North Carolina's budgetary woes. We there-

fore hold that the injunction serves the public interest and affirm the district court's judgment on this issue despite its failure to properly consider this prong of the *Winter* test.

## VI.

The DHHS further contends that we should vacate the district court's order because it does not comply with Federal Rule of Civil Procedure 65, which lays out certain requirements for a preliminary injunction. Specifically, the DHHS alleges (1) that the order violates Rule 65(d) because it lacks specificity and (2) that it contravenes Rule 65(c) because the district court neglected to address the issue of security. For the reasons below, the district court's order failed to satisfy both of these requirements.

## A.

Rule 65(d) requires courts granting injunctions to "describe in reasonable detail . . . the act or acts restrained or required." The Supreme Court has explained that Rule 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). In light of these important purposes, "the specificity provisions of Rule 65(d) are no mere technical requirements" and "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.* Consequently, to comply with Rule 65(d), the district court's order must be clear enough to inform the DHHS of what it may and may not do.

The order at issue in this case "prohibited [the DHHS] from implementing IHCA Policy 3E," which the district court mistakenly assumed would "require only that [the DHHS] continue to provide for in-home PCS for those Plaintiffs who were found to be entitled to such benefits prior to June 1,

2011." *Pashby*, 279 F.R.D. at 356. When the DHHS proceeded to undo IHCA Policy 3E in its entirety and implement the previous policy, the PCS Recipients took issue with some of the changes, causing the district court to clarify that the injunction simply required the DHHS to continue offering in-home PCS to the plaintiffs who qualified for it before IHCA Policy 3E took effect. This clarification begs the question: Even though the district court has prohibited the DHHS from implementing Policy 3E, must the DHHS continue to follow that policy's requirements with respect to issues that do not touch upon providing in-home PCS to the PCS Recipients? Notably, the DHHS has no way to ascertain which eligibility requirements should apply to individuals who sought in-home PCS after IHCA Policy 3E went into effect on June 1, 2011. These ambiguities indicate that the district court has not described the enjoined conduct "in reasonable detail," and the order therefore violates Rule 65(d).

## B.

Rule 65 further specifies that a "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c). As the PCS Recipients correctly point out, the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). However, the district court must expressly address the issue of security before allowing any waiver and cannot "disregard the bond requirement altogether." *Hoechst Diafoil*, 174 F.3d at 421. By failing to consider whether to require security, the district court erred. Nevertheless, because the district court correctly found that the PCS Recipients established the need for a preliminary injunction, we have decided to remand this case without vacating the order, which will allow the district court to remedy the order's Rule 65 defects. On remand, the district court must clarify its order and address the issue of security.

VII.

For the foregoing reasons, we remand this action for further proceedings consistent with this opinion.

*REMANDED*

---

AGEE, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion except as to part of Section V, which concludes that the district court properly granted the PCS Recipients'[1] motion for a preliminary injunction based on the ADA and Rehabilitation Act and Medicaid Act claims. The district court's analysis and rationale in granting the preliminary injunction was, to be charitable, perfunctory and conclusory; to be accurate, it was plainly arbitrary and capricious and an abuse of the district court's discretion. In my view, neither the record nor precedent supports the grant of the preliminary injunction under the standard set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Accordingly, I respectfully dissent as to the above-noted parts of Section V of the majority opinion.[2]

I

The sovereign state of North Carolina has voluntarily elected to offer PCS coverage to disabled persons under its state Medicaid program. While states participating in Medic-

---

[1] For brevity and clarity, I adopt the same conventions as in the majority opinion, so, for example, I refer to the plaintiffs as the "PCS Recipients."

[2] As I would vacate the preliminary injunction, it is unnecessary for me to address Section VI of the majority opinion, which permits the injunction to remain in place despite the district court's failure to comply with Rule 65.

aid must provide coverage for certain services, such as prenatal care for qualifying pregnant women, 42 C.F.R. § 440.210(a)(2), states may choose not to provide coverage for other services, such as PCS, *see* 42 C.F.R. § 440.225. Thus, North Carolina could choose to eliminate its purely voluntary PCS coverage altogether and continue to receive federal Medicaid funds for its other services.

North Carolina initiated the current changes to its PCS coverage in 2010 in response to concerns over abuse of the PCS program and a severe state budget crisis. Like many other states, North Carolina has a constitutional provision requiring a balanced budget that prevents it from running a deficit. *See* N.C. Const. art. III, § 5(3).[3]

## II

A party "seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary

---

[3]The North Carolina constitution provides:

The total expenditures of the State for the fiscal period covered by the budget shall not exceed the total of receipts during that fiscal period and the surplus remaining in the State Treasury at the beginning of the period. To insure that the State does not incur a deficit for any fiscal period, the Governor shall continually survey the collection of the revenue and shall effect the necessary economies in State expenditures, after first making adequate provision for the prompt payment of the principal of and interest on bonds and notes of the State according to their terms, whenever he determines that receipts during the fiscal period, when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgeted expenditures. This section shall not be construed to impair the power of the State to issue its bonds and notes within the limitations imposed in Article V of this Constitution, nor to impair the obligation of bonds and notes of the State now outstanding or issued hereafter.

N.C. Const. art. III, § 5(3).

relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The court reviews a district court's decision to grant a preliminary injunction for an abuse of discretion, reviewing factual determinations for clear error and legal conclusions de novo. *United States v. M/V Sanctuary*, 540 F.3d 295, 302 (4th Cir. 2008).

As to the first *Winter* factor, the district court concluded, and the majority opinion agrees, that the PCS Recipients demonstrated a likelihood of success on two claims: (1) ADA and Rehabilitation Act, and (2) Medicaid Act comparability. For the reasons set forth below, I respectfully disagree.

A

*ADA and Rehabilitation Act Claims*

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a) (Rehabilitation Act).[4] In its enactment of the ADA, Congress stated that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

---

[4]As the majority points out, the integration requirement of the ADA is co-extensive with that of the Rehabilitation Act. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). However, section 504 of the Rehabilitation Act, unlike the ADA, "contains no express recognition that isolation or segregation of persons with disabilities is a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 n.11 (1999). Thus, whether the Rehabilitation Act encompasses claims alleging the "unjustified institutional isolation of persons with disabilities" is an open question, *id.* at 600, but one that does not require resolution for purposes of this appeal.

In construing this and similar provisions, the Supreme Court has noted that "*[u]njustified* isolation . . . is properly regarded as discrimination based on disability," that the "*unjustified* institutional isolation of persons with disabilities is a form of discrimination" under the ADA, and that "Congress explicitly identified *unjustified* segregation of persons with disabilities as a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597, 600 (1999) (quoting 42 U.S.C. § 12101(a)(2)) (emphasis added, internal quotation marks and brackets omitted). The Supreme Court has expressly rejected the proposition "that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'" *Id.* at 603 n.14. Likewise, the regulations promulgated under the ADA specifically state, "This part does not require a public entity to provide to individuals with disabilities . . . services of a personal nature including assistance in eating, toileting, or dressing," 28 C.F.R. § 35.135—the very services that the PCS Recipients claim the ADA requires North Carolina to provide.

A state need not modify a policy to accommodate persons with disabilities if those modifications "would fundamentally alter the nature of the service, program, or activity" provided under that policy. 28 C.F.R. § 35.130(b)(7). In considering such a "fundamental alteration" defense for a state program, the Supreme Court has instructed that states are required to provide community-based treatment alternatives only "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, *taking into account the resources available to the State and the needs of others with . . . disabilities*." *Olmstead*, 527 U.S. at 607 (emphasis added). Thus, a state should succeed in its fundamental alteration defense if it shows "that, in the *allocation of available resources*, immediate relief for the plaintiffs would be inequitable, given the responsibility the State

has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities." *Id.* at 604 (emphasis added).

Despite the Supreme Court's clear guidance, the district court disregarded North Carolina's fundamental alteration defense and the justifications for its change to state law. In affirming the district court, the majority opinion also limits its analysis to the PCS Recipients' "significant risk of institutionalization"[5] and fails to acknowledge and weigh the state's justifications for its change in policies. I believe this is an abuse of discretion as a matter of law and requires reversal of the district court's grant of the preliminary injunction.

The PCS Recipients allege in their complaint that the state's "denial of coverage of personal care services that Plaintiffs require in order to avoid institutional placements and to remain in the integrated home settings appropriate to their needs constitutes unlawful discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132." J.A. 973. They assert that the state has discriminated against them in violation of the ADA by "failing to ensure that Plaintiffs have access to Medicaid-covered personal care services that meet their needs in the community and/or requiring Plaintiffs to

---

[5]The state argues on appeal that the adult care homes at issue in this case are not "institutions" within the meaning of the ADA. As the district court did not consider this issue, that court is the appropriate forum before which the issue should be addressed. The district court should determine in the first instance whether adult care homes in North Carolina are sufficiently segregated from society that they are properly considered "institutions" within the meaning of the ADA. *See Olmstead*, 527 U.S. at 600 (focusing on institutional confinement and segregation as primary considerations); *see also* 42 U.S.C. § 12101(a)(2) (discussing congressional concern over isolation and segregation of individuals with disabilities); *see generally* Michel Foucault, *History of Madness* 44–77 (Jean Khalfa ed., Jonathan Murphy & Jean Khalfa trans., Routledge 2006) (1961) (discussing the societal shift to confinement and exclusion of persons with mental disabilities). I therefore assume, only *arguendo*, that the adult care homes are institutions for purposes of this opinion.

live in institutional settings in order to obtain the services they need." J.A. 974.

However, North Carolina is not required to maintain any particular level of care to prevent the PCS Recipients from entering an institution. *Olmstead*, 527 U.S. at 603 n.14 ("We do not in this opinion hold that the ADA imposes on the States a standard of care for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." (internal quotation marks omitted)). Nor does the ADA ensure the provision of PCS to prevent the institutionalization of persons with disabilities. 28 C.F.R. § 35.135 ("This part does not require a public entity to provide to individuals with disabilities . . . services of a personal nature including assistance in eating, toileting, or dressing.").

Once a state endeavors to provide PCS to individuals with disabilities through its Medicaid program, however, it must administer those services "in the most integrated setting appropriate." 28 C.F.R. § 35.130(d). Thus, the state may not "requir[e the PCS Recipients] to live in institutional settings," J.A. 974, in order to receive a provided service *without justification. See Olmstead*, 527 U.S. at 600. But the PCS Recipients have presented no evidence that North Carolina has *required* them to enter an institution or that North Carolina's policies have created a pervasive or severe risk of institutionalization. And even assuming, *arguendo*, that the PCS Recipients have demonstrated that they face a severe risk of institutionalization, the state's fundamental alteration argument establishes a bona fide justification for its policies, which, for the reasons set forth below, defeats the PCS Recipients' claim at this stage of the proceedings.

The majority opinion recognizes that "the district court did not explain the reasoning behind its determination that the PCS Recipients are 'at risk of segregation.'" Majority Op. 18 (quoting *Pashby v. Cansler*, 279 F.R.D. 347, 355 (E.D.N.C.

2011)). Yet the majority opinion makes the same basic assumption as the district court must have made: that "individuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise successful Title II and Rehabilitation Act claims because they face a risk of institutionalization." Majority Op. 18. And in so doing, neither the district court nor the majority consider all the objective facts in the record or the caselaw on point. The only evidence that the PCS Recipients provide to demonstrate that they face institutionalization consists of self-serving declarations of a limited minority of their membership that they "may," "might," "probably," or "likely" would enter an adult care home because their in-home PCS coverage had been terminated. *See* Majority Op. 18-19. None of the PCS Recipients presents the objective opinion of a medical professional to support his or her declaration or any other competent non-subjective evidence beyond these declarations. Thus, the majority opinion's conclusion that the PCS Recipients are individuals who "must enter institutions" to receive PCS coverage is simply not supported by the record. Majority Op. 18.

In addition, by concluding that the PCS Recipients are likely to succeed on their ADA claim, the majority opinion appears to equate *any* risk of institutionalization with the substantially higher actual legal standard, which is a "*serious* risk of institutionalization." *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012) (emphasis added). It is not enough for the PCS Recipients to show that they face some risk of institutionalization; they must show that the risk of institutionalization that they face is actual and severe. *See V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009) (requiring a showing of a "*severe* risk of institutionalization" (emphasis added)); *see also G. v. Hawaii*, 676 F. Supp. 2d 1046, 1057 (D. Haw. 2009) ("A state's reduction in services may violate the integration mandate where it unjustifiably forces or will likely force beneficiaries from an integrated environment into institutional care."). The PCS Recipients have shown nothing more than a generalized, uncertain risk that a limited number

of them could face entering an adult care home. *Cf. M.R.*, 697 F.3d at 717 (Bea, J., dissenting from the denial of rehearing en banc) (arguing that a risk of institutionalization created "by the lessening of the services previously provided" cannot violate the ADA). Thus, the PCS Recipients fall well short of satisfying their burden under *Winter* to demonstrate a likelihood of success on the merits.

But even assuming, *arguendo*, that the PCS Recipients had presented evidence of a severe risk of institutionalization, they still cannot satisfy *Winter*'s likelihood of success on the merits requirement because North Carolina has established a significant fundamental alteration defense that justifies its change in law. In presenting its fundamental alteration defense, the state provides three reasons justifying its decision to provide PCS to individuals residing at home according to different criteria than those it applies to individuals residing in adult care homes. First, the state points to its budget crisis. Second, the state describes the problem of abuse of the in-home PCS program. And third, the state shows that persons receiving PCS at home are a qualitatively different group with much different needs than those receiving PCS in adult care homes.

With respect to North Carolina's fiscal justification, state budgetary restrictions are "clearly relevant" to a fundamental alteration defense. *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005). Yet the district court failed to consider these concerns notwithstanding the state constitutional mandate of a balanced budget. The district court summarily concluded, without analysis or reference, that "[t]he record in this case does not indicate that Defendant will have to make a fundamental alteration of the [PCS] program in order to comply with the ADA's integration mandate." *Pashby*, 279 F.R.D. at 355. The majority opinion only nominally mentions the state's budgetary constraints, summarily concluding that "financial constraints alone cannot sustain a fundamental alteration defense." Majority Op. 21. In

my view, both the district court and the majority opinion reach arbitrary and unsupported conclusions.

Although some courts hold that "budgetary constraints alone are insufficient to establish a fundamental alteration defense," *Pa. Prot. & Advocacy*, 402 F.3d at 380,[6] *Olmstead* very clearly sets out that a state must provide community-based programs only after "taking into account the resources available to the State and the needs of others with . . . disabilities." 527 U.S. at 607. Here, the state's budget was severely constrained as a result of the national financial crisis and North Carolina is constitutionally prohibited from running a deficit. There is no evidence in the record to suggest that this is a case in which North Carolina arbitrarily elected not to make certain expenditures that the PCS Recipients desire the state to make. Rather, North Carolina simply had no choice but to make significant changes to its prior levels of expenditure of public funds to comply with fiscal reality and its constitutional mandate.

The duly elected government of North Carolina has determined in an open, public process that, in view of the resources available to the state and the diminution in other government services that must result from greater expenditure on in-home PCS, it was necessary and appropriate to reduce the appropriation for in-home PCS coverage. *Cf. Olmstead*, 527 U.S. at 604; *Pa. Prot. & Advocacy*, 402 F.3d at 383. The district court and majority opinion give no cognizable weight to this vital element of the *Olmstead* analysis and, in doing so, act arbitrarily. Basic principles of federalism demand a fair hearing of North Carolina's factual argument, and it was an abuse of

---

[6]This approach has been strongly called into question. *See M.R.*, 697 F.3d at 713–20 (Bea, J., dissenting from the denial of rehearing en banc). A "fundamental reality of our democracy" is the fact that limited revenue requires limited spending. *Id.* Elected state legislators, who are accountable to their constituents, must decide how to balance spending with revenue. Those decisions should not be lightly cast aside by spending mandates from unelected federal judges.

discretion for the district court to fail to do so. The people of North Carolina, through their duly elected government, made difficult decisions among limited options. To overturn that choice requires a far more weighty record and clear precedent than exists in this case.

North Carolina presented two additional non-budgetary reasons for its reduction of in-home PCS that were also ignored by the district court and the majority opinion. The state has indicated, both before the district court and before this court, that it revised the in-home PCS program in part in response to concerns that the program has been subject to substantial abuse and fraud.

Each dollar that North Carolina expends on the PCS Recipients reduces the amount that the state can spend in any other area, including for all classes of citizens with disabilities. Significantly, North Carolina has also shown that it reduced in-home PCS coverage based not only upon a consideration of "the resources available to the State," but also by taking into account the "needs of others with . . . disabilities." *Olmstead*, 527 U.S. at 607. The in-home PCS recipients and those PCS recipients residing in adult care homes are different groups with different needs. The state posits that it therefore is a rational and non-arbitrary decision to offer PCS to persons in these disparate groups according to different standards, and it would be a fundamental alteration of its PCS program to require the state to apply the same standards to these two very different groups. Thus, North Carolina's decision regarding the allocation of its available resources for PCS coverage was based upon a consideration of the needs of all of its citizens with disabilities, not simply the PCS Recipients.

Thus, even assuming that the PCS Recipients established a prima facie case of discrimination under the ADA on their claim that the state has "requir[ed] Plaintiffs to live in institutional settings in order to obtain the services they need," J.A. 974, (which is a significant stretch), the state has presented a

series of compelling justifications for its policy: (1) the state has limited resources and is constrained by a constitutional balanced budget mandate, (2) the state must make expenditures and cuts on an equitable basis, (3) a failure to equitably include in-home PCS will result in greater cuts elsewhere, (4) fraudulent in-home PCS claims are a growing concern, and (5) those receiving in-home PCS have much different needs than those receiving PCS in adult care homes. These justifications for its policy establish a substantial fundamental alteration defense. I would therefore hold that the district court abused its discretion by arbitrarily ignoring the state's justifications and refusing to apply this defense and that the PCS Recipients failed to establish the necessary *Winter* factor of likelihood of success on the merits.

B

*Medicaid Act*

As CMS is the administrative agency of the federal government directed by statute to administer the Medicaid Act, courts owe substantial deference to its construction of that Act. *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1210 (2012); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."). In reviewing CMS decisions, we may not "substitute our judgment for that of the agency" and will overrule those decisions "only if we find that it has failed to consider relevant factors and committed a clear error of judgment." *Md. Dep't of Health & Mental Hygiene v. CMS*, 542 F.3d 424, 427–28 (4th Cir. 2008) (quoting *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007)) (internal quotation marks omitted).

In this case, CMS approved North Carolina's application of different PCS eligibility criteria to persons living at home and

persons living in group homes. *See* J.A. 170, 173. In the CMS-approved SPA, North Carolina proposed to provide PCS to persons living in adult care homes when they require "[a]ssistance with at least two of . . . seven ADLs at the limited, extensive, or full dependency level," J.A. 173, while the state would provide PCS coverage to persons living at home when they require assistance with "[t]hree of the five qualifying ADLs at the limited level," J.A. 177. The PCS Recipients concede CMS's approval of this disparity in their complaint:

> 158. SPA 10-31 also described requirements for covering PCS in ACHs (addressed below). The eligibility requirements for PCS in ACHs are much less stringent than PCS for individuals 21 years or older living at home (renamed IHCA).

> 159. CMS approved SPA 10-31 in April 2011.

J.A. 967. A reasonable conclusion drawn from this approval is that, in the view of CMS (the relevant administrative agency), North Carolina's use of more stringent PCS requirements for individuals living at home than for individuals living in adult care homes does not violate the Medicaid Act. Because an agency's interpretation of the statute that it has been entrusted to administer is entitled to deference under *Chevron*, the court is required to defer to the agency's conclusion unless the court determines that CMS "committed a clear error of judgment." *Md. Dep't of Health & Mental Hygiene*, 542 F.3d at 427–28 (quoting *Thompson*, 475 F.3d at 212) (internal quotation marks omitted).

Although CMS approved North Carolina's use of more stringent PCS requirements for individuals living at home than for individuals living in adult care homes by its approval letter of April 15, 2011, the district court failed not only to give any deference to the CMS decision, it failed to consider the issue of deference at all. By interpreting the comparability provision of the Medicaid Act while failing to consider

CMS's construction of this provision, the district court clearly erred and therefore abused its discretion.

Similarly, the majority opinion "decline[s] to address [North Carolina's] argument that the CMS's approval of the SPA is entitled to *Chevron* deference," Majority Op. 22, despite clear precedent that the agency's construction of the Medicaid Act in its approval of a state SPA is entitled to *Chevron* deference or, at least, a reasoned conclusion that CMS committed a clear error of judgment upon which deference is declined. *See Md. Dep't of Health & Mental Hygiene*, 542 F.3d at 427–28. Instead, the majority opinion concludes that *Chevron* does not apply in this case because "regardless of whether the CMS found that the SPA complied with the Social Security Act, it never determined that IHCA Policy 3E alone did so." Majority Op. 21.

The distinction drawn by the majority opinion is neither relevant nor conclusive as to *Chevron* consideration because the PCS Recipients' complaint is directed solely toward North Carolina's application of more stringent PCS eligibility criteria to persons living at home than to persons living in adult care homes. Regardless of whether North Carolina fully implemented the CMS-approved SPA, the agency's construction of the Medicaid Act in approving the SPA is entitled to deference as a matter of law unless the court concludes that the agency's construction was a clear error of judgment. *See Chevron*, 467 U.S. at 844; *Md. Dep't of Health & Mental Hygiene*, 542 F.3d at 427–28. Absent such clear error, the court must defer to the view of CMS that North Carolina's adoption of more stringent PCS eligibility criteria for persons living at home than for persons living in adult care homes does not violate the Medicaid Act.

In support of the contention that CMS determined that North Carolina's PCS program violated the Medicaid Act, the PCS Recipients cite a letter dated January 20, 2011 from CMS, stating:

> We have consulted with the Office of General Counsel (OGC) who has advised that the State appears to be violating comparability by currently offering and proposing to continue to offer a different PCS benefit for persons residing in their own homes and those residing in ACHs and SLHs. *We will need to discuss this further with the State*.

J.A. 88 (emphasis added).[7] Far from making a determination in January 2011, CMS merely raised concerns to be discussed with the state, as this letter indicates.

The more salient fact in this case is that CMS subsequently *approved* the state's SPA, which included more stringent PCS eligibility criteria for persons living at home than for those living in adult care homes, several months *after* sending the above letter noting its concerns. Any reliance on the January 20, 2011 letter to conclude either that CMS determined that North Carolina's policies violate the comparability provision of the Medicaid Act or that the PCS Recipients are likely to succeed on their Medicaid Act claim is error.

Nonetheless, because we may overrule an agency's decision "if we find that it has failed to consider relevant factors and committed a clear error of judgment," *Md. Dep't of Health & Mental Hygiene*, 542 F.3d at 427–28 (quoting *Thompson*, 475 F.3d at 212 (internal quotation marks omitted)), I turn next to the substance of the PCS Recipients' Medicaid Act claim. That analysis requires a review of whether the CMS determination that North Carolina's policies do not violate the Medicaid Act was, in fact, "a clear error of judgment." It was not.

---

[7]The PCS Recipients argue that the court should apply *Chevron* deference to this January 20 letter rather than to the CMS decision approving North Carolina's SPA. The January 20 letter, however, is "beyond the *Chevron* pale" as, unlike the CMS approval of North Carolina's SPA, it lacks the force of law. *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001).

States accepting federal Medicaid funds may provide medical assistance to two groups of eligible applicants—the categorically needy and the medically needy. *See id.* at 429. The categorically needy are individuals whose income falls below a certain level. *See* 42 U.S.C. § 1396a(a)(10)(A). The medically needy, on the other hand, are individuals whose medical expenses exceed their ability to pay. *See* 42 U.S.C. § 1396a(a)(10)(C). While states accepting Medicaid funds must provide coverage to the categorically needy, states may choose not to provide coverage to the medically needy. *Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006).

The Medicaid Act contains a "comparability mandate," which provides that

> medical assistance made available to any individual described in subparagraph (A) [i.e., the categorically needy]—
>
>> (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual [i.e., any other categorically needy individual], and
>>
>> (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A) [i.e., the medically needy].

42 U.S.C. § 1396a(a)(10)(B). CMS has adopted a regulation interpreting this statute that provides:

> (a) The [state Medicaid] plan must provide that the services available to any categorically needy beneficiary under the plan are not less in amount, duration,

and scope than those services available to a medically needy beneficiary; and

(b) The [state Medicaid] plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all beneficiaries within the group:

    (1) The categorically needy.

    (2) A covered medically needy group.

42 C.F.R. § 440.240. The comparability mandate thus "prevents discrimination against or among the categorically needy." *Lankford*, 451 F.3d at 505; *Schott v. Olszewski*, 401 F.3d 682, 686 (6th Cir. 2005) (holding that states must "provide comparable medical assistance to all Medicaid recipients within each classification, so long as the medically needy do not receive greater benefits than the categorically needy (although the reverse is permitted)"). The PCS Recipients offer no indication of whether they are categorically needy or medically needy.[8]

But even assuming, *arguendo*, that the PCS Recipients are categorically needy, a full reading of § 1396a(a)(10)(B) demonstrates that the PCS Recipients are not likely to succeed on their Medicaid Act claim. The district court concluded and the

---

[8]Without any indication as to whether the PCS Recipients are categorically needy or medically needy, the district court had no basis upon which to conclude that the PCS Recipients are likely to succeed on their Medicaid Act comparability claim. The district court made no finding that the PCS Recipients are categorically needy, nor do the PCS Recipients allege in their complaint that they fall within that status. *See* J.A. 975. The PCS Recipients have failed to plead essential elements of a claim under § 1396a(a)(10)(B) so as to demonstrate that the complaint would survive a motion to dismiss for failure to state a claim. For this reason as well, the PCS Recipients cannot show that they are likely to succeed on the merits of their Medicaid Act claim for purposes of the *Winter* analysis.

majority opinion agrees that § 1396a(a)(10)(B) requires that "comparable medical assistance be provided to individuals with comparable needs." *Pashby*, 279 F.R.D. at 354; *see* Majority Op. 21. Applying this conclusion, both the district court and the majority opinion hold that any disparate treatment between any two arguably similar groups of people violates the comparability provision of the Medicaid Act and that, therefore, North Carolina's provision of PCS coverage to two different groups according to different criteria violates that Act.

The statute, however, when read as a whole, demonstrates that both the district court and the majority misinterpret § 1396a(a)(10)(B). Rather than ensuring that all "individuals with comparable medical needs must receive comparable medical assistance," Majority Op. 21, the Medicaid Act's comparability mandate protects against only three types of discrimination: (1) discrimination against the categorically needy, (2) discrimination among the categorically needy, and (3) discrimination among the medically needy, *see* 42 C.F.R. § 440.240. In contrast to the ADA, which focuses on "the *location* of services," *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003), the comparability provision of the Medicaid Act focuses not on *where* services will be provided (for example, at home or in a care facility), but instead on "*whether* the services will be provided" to the categorically needy. *Townsend*, 328 F.3d at 517.

Moreover, the comparability requirement must be read in view of clear regulatory guidance that a state "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d). A state therefore does not violate the comparability provision of the Medicaid Act even when it provides different coverage to different categorically needy individuals, for example, so long as the coverage it provides bears a "reasonable relation to the particular needs of the individual." *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 993 (N.D. Cal.

2010); *see, e.g.*, *V.L.*, 669 F. Supp. 2d at 1115 (holding that a state's eligibility criteria must "reasonably measure[] the individual need of a disabled or elderly person for a particular service"); *Casillas v. Daines*, 580 F. Supp. 2d 235, 244–45 (S.D.N.Y. 2008) (holding that the state's coverage of a certain service for persons with one diagnosis does not mean that the state must provide the same coverage to persons with different diagnoses, even if they would also benefit from that coverage).

In the case at bar, North Carolina has shown that persons receiving in-home PCS coverage have different needs than those receiving PCS coverage in an adult care home and that it provides PCS coverage to persons in those separate groups according to appropriate, individualized, rational, medical needs-based eligibility criteria. The record reflects that in-home PCS recipients must demonstrate that they do "[n]ot require monitoring, supervision, or ongoing care from a licensed health care professional," J.A. 177, i.e., that they are able to safely live at home. In contrast, the record also reflects that those receiving PCS coverage in an adult care home must certify that they are "subject to health, safety, and security risks because there is no capable and willing caregiver to assure that [their] health and welfare needs are met in a private residence," i.e., that they are unable to live safely at home. J.A. 173. Thus, in its provision of PCS coverage, North Carolina has drawn a rational distinction between two different groups of people—those who are able to live safely at home and those who are not.

The majority opinion disregards the salient distinction that in-home PCS recipients and adult care home PCS recipients are different groups with different needs as "simply inaccurate," Majority Op. 22, disregarding the evidence in the record and citing only a section of the North Carolina Administrative Code to argue that any person requiring PCS could be admitted to an adult care home, making those groups indistinguishable. Yet a full reading of that provision demonstrates that it

is, in fact, entirely consistent with the State's argument that its decision to distinguish at-home PCS recipients from adult care home PCS recipients was reasonable:

> Any adult (18 years of age or over) who, because of a temporary or chronic physical condition or mental disability, needs a substitute home may be admitted to an adult care home when, in the opinion of the resident, physician, family or social worker, and the administrator the services and accommodations of the home will meet his particular needs.

10A N.C. Admin. Code 13F.0701. The regulation establishes that a person may be admitted to an adult care home only when that person, "because of a temporary or chronic physical condition or mental disability, needs a substitute home." *Id.* It therefore does nothing to contradict the state's argument that the two groups at issue are qualitatively different and that its decision to draw a distinction between these two groups is reasonable.[9]

As persons receiving in-home PCS coverage under the challenged policy must demonstrate that they do "[n]ot require monitoring, supervision, or ongoing care from a licensed health care professional," J.A. 177, i.e., that they can live safely at home, it follows that they do not "need[] a substitute home," at least not "because of a temporary or chronic

---

[9] The majority opinion suggests that nearly any person could be admitted into an adult care home under this regulation for "any number of reasons," as long as that person certifies, in his own opinion, that he "needs a substitute home." Majority Op. 22. Yet the majority's reading of the regulation disregards the clear regulatory language that a person may enter an adult care home only if that person needs a substitute home "because of a temporary or chronic physical condition or mental disability." 10A N.C. Admin. Code 13F.0701. Regardless, the issue that the court must consider is not whether certain persons within these two groups may overlap in some cases, but whether North Carolina's distinction between these two groups is reasonable. *See Cota*, 688 F. Supp. 2d at 993. It is.

physical condition or mental disability," 10A N.C. Admin. Code 13F.0701. This is a major point of distinction between these two groups that the PCS Recipients do not and cannot dispute.

The majority opinion states that "both in-home PCS recipients and ACH PCS recipients must demonstrate that family members or friends cannot provide the assistance that they need, which prevents DHHS from pointing to this requirement as a basis to distinguish the medical needs of in-home PCS and ACH PCS recipients." Majority Op. 22-23. The majority misses the point. Of course both groups of PCS recipients must demonstrate that they require care. But that does not change the fact that the state is expressly permitted to engage in rational line-drawing in its provision of PCS coverage. *See* 42 C.F.R. § 440.230(d). North Carolina has demonstrated that the two groups at issue have different needs and require different levels of care. The PCS Recipients present no evidence to the contrary. Thus, based upon the law and the evidence in the record, North Carolina's distinction between these two groups is reasonable and does not contravene the comparability provisions of the Medicaid Act.

Under a plain reading of North Carolina's policies, all categorically needy individuals who need limited assistance with at least two ADLs, J.A. 173, and who "because of a temporary or chronic physical condition or mental disability, need[] a substitute home," 10A N.C. Admin. Code 13F.0701, qualify for and may receive PCS coverage in an adult care home. And all categorically needy individuals who need limited assistance with at least three ADLs and do "[n]ot require monitoring, supervision, or ongoing care from a licensed health professional," J.A. 177, qualify for in-home PCS coverage. The PCS Recipients are therefore unable to show discrimination against or among the categorically needy, as required under § 1396a(a)(10)(B). *See Lankford*, 451 F.3d at 505. The state's distinctions in the provision of PCS coverage are drawn across a rational, needs-based consideration among two

distinct groups: those who can live safely at home, and those who cannot. North Carolina's PCS policy simply does not violate the actual, express requirements of the Medicaid Act.

For all these reasons, I would hold that the PCS Recipients failed to demonstrate that they are likely to succeed on the merits of their Medicaid Act comparability claim and that the district court abused its discretion by failing to apply, or even recognize, the correct legal standards in determining that issue.[10]

## III

The portion of the district court's order in this case granting the preliminary injunction exemplifies an arbitrary and capricious decision. It was an abuse of discretion as a matter of law. The majority opinion errs in affirming that order for the reasons set forth above. Accordingly, I respectfully dissent from the portion of Section V of the majority opinion regarding the ADA and Rehabilitation Act and Social Security Act claims. For that reason, I would vacate the district court's order granting the preliminary injunction and remand for further proceedings.

---

[10]As I conclude that the PCS Recipients are not likely to succeed on the merits of any of their claims, their failure to meet that *Winter* factor makes it unnecessary to address the remaining *Winter* factors. *See Winter*, 555 U.S. at 20 (holding that "[a] plaintiff seeking a preliminary injunction must establish" all factors).