**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1160**

HIAS, INC.; CHURCH WORLD SERVICE, INC.; LUTHERAN IMMIGRATION
& REFUGEE SERVICE, INC.,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States;
MICHAEL R. POMPEO, in his official capacity as Secretary of State; ALEX M.
AZAR, II, in his official capacity as Secretary of Health and Human Services; CHAD
WOLF, in his official capacity as Acting Secretary of Homeland Security,

Defendants - Appellants,

------------------------------

STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF MARYLAND;
STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF MAINE; COMMONWEALTH OF
MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE
OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE
OF OREGON; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE
ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE
OF WASHINGTON; REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICE; INTERNATIONAL RESCUE
COMMITTEE; UNITED STATES CONFERENCE OF CATHOLIC BISHOPS;
WORLD RELIEF; THE MOST REVEREND MICHAEL BRUCE CURRY;
PRESIDING BISHOP OF THE EPISCOPAL CHURCH; ETHIOPIAN
COMMUNITY DEVELOPMENT COUNCIL, INC.; CITY OF TEMPE, AZ; CITY
OF TUCSON, AZ; CITY OF ALAMEDA, CA; CITY OF LOS ANGELES, CA;
COUNTY OF LOS ANGELES, CA; COUNTY OF MONTEREY, CA; CITY OF
OAKLAND, CA; CITY OF SACRAMENTO, CA; CITY AND COUNTY OF SAN
FRANCISCO, CA; COUNTY OF SANTA CLARA, CA; CITY OF SANTA
MONICA, CA; CITY OF WEST HOLLYWOOD, CA; CITY AND COUNTY OF

DENVER, CO; CITY OF ST. PETERSBURG, FL; CITY OF BOISE, ID; CITY OF CHICAGO, IL; CITY OF HOLYOKE, MA; CITY OF SOMERVILLE, MA; CITY OF ST. PAUL, MN; CITY OF LINCOLN, NE; CITY OF ALBUQUERQUE, NM; CITY OF SANTA FE, NM; NEW YORK CITY, NY; TOWN OF CARRBORO, NC; CITY OF COLUMBUS, OH; CITY OF CINCINNATI, OH; CITY OF PORTLAND, OR; CITY OF PHILADELPHIA, PA; CITY OF PROVIDENCE, RI; CITY OF KNOXVILLE, TN; CITY OF AUSTIN, TX; COUNTY OF HARRIS, TX; CITY OF HOUSTON, TX; COUNTY OF KING, WA; CITY OF SEATTLE, WA; CITY OF TACOMA, WA; CITY OF MADISON, WI; U. S. CONFERENCE OF MAYORS; LAUREN MCLEAN, Mayor of Boise, ID; DAVID R. MARTIN, Mayor of Stamford, CT; RICK KRISEMAN, Mayor of St. Petersburg, FL; NOAM BRAMSON, Mayor of New Rochelle, NY; ALEX MORSE, Mayor of Holyoke, MA; MICHAEL DUGGAN, Mayor of Detroit, MI; FORMER STATE DEPARTMENT OFFICIALS,

Amici Supporting Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, Senior District Judge. (8:19-cv-03346-PJM)

Argued: October 27, 2020                          Decided: January 8, 2021

Before KING, KEENAN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Judge King and Judge Harris joined.

**ARGUED:** Amanda Lee Mundell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Justin Bryan Cox, INTERNATIONAL REFUGEE ASSISTANCE PROJECT, Atlanta, Georgia, for Appellees. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Melissa S. Keaney, Fair Oaks, California, Linda Evarts, Mariko Hirose, INTERNATIONAL REFUGEE ASSISTANCE PROJECT, New York, New York; Jeffrey J. Resetarits, Deke Shearon, SHEARMAN & STERLING, New York, New York, for Appellees. Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, Jeff VanDam, Public Interest Counsel, Isaac Jones, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus

State of Illinois. Xavier Becerra, Attorney General, Michael L. Newman, Senior Assistant Attorney General, Cherokee DM Melton, Supervising Deputy Attorney General, Vilma Palma-Solana, Deputy Attorney General, Jasleen K. Singh, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Los Angeles, California, for Amicus State of California. Brian E. Frosh, Attorney General, Steven M. Sullivan, Solicitor General, Jeffry P. Dunlap, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Phil Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Dover Delaware, for Amicus State of Delaware. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Maura Haley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, for Amicus Commonwealth of Massachusetts. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, for Amicus State of Minnesota. Gurbir S. Grewal, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Newark, New Jersey, for Amicus State of New Jersey. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, for Amicus State of New Jersey. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, for Amicus State of Oregon. Josh Shapiro, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Philadelphia, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Peter Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, for Amicus Commonwealth of Virginia. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Ofelia Lee Calderón, CALDERÓN SEGUIN, Fairfax, Virginia; Manoj Govindaiah, Maria Osornio, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, San Antonio, Texas, for Amicus Refugee and Immigrant Center for Education and Legal Services. Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Danielle L. Goldstein, Deputy City Attorney, Michael Dundas, Deputy City Attorney, OFFICE OF THE LOS ANGELES CITY ATTORNEY, Los Angeles, California, for Amicus City of Los Angeles. George S. Cardona, Interim City Attorney, CITY ATTORNEY'S OFFICE, Santa Monica, California, for Amicus City of

Santa Monica, California. Susana Alcala Wood, City Attorney, CITY ATTORNEY'S OFFICE, Sacramento, California, for Amicus City of Sacramento, California. Leslie J. Girard, County Counsel, William Litt, Deputy County Counsel, COUNTY ATTORNEY'S OFFICE, Salinas, California, for Amicus County of Monterey, California. Esteban A. Aguilar, Jr., City Attorney, CITY ATTORNEY'S OFFICE, Albuquerque, New Mexico, for Amicus City of Albuquerque, New Mexico. Peter S. Holmes, Seattle City Attorney, CITY ATTORNEY'S OFFICE, Seattle, Washington, for Amicus City of Seattle, Washington. Kristin M. Bronson, City Attorney, CITY ATTORNEY'S OFFICE, Denver, Colorado, for Amicus City and County of Denver, Colorado. Lyndsey M. Olson, City Attorney, CITY ATTORNEY'S OFFICE, St. Paul, Minnesota, for Amicus City of St. Paul. Eli Savit, Detroit, Michigan, for Amicus Mayor Michael E. Duggan, City of Detroit, Michigan. Yibin Shen, City Attorney, CITY ATTORNEY'S OFFICE, Alameda, California, for Amicus City of Alameda, California. Judi Baumann, City Attorney, CITY ATTORNEY'S OFFICE, Tempe, Arizona, for Amicus City of Tempe, Arizona. Anne L. Morgan, City Attorney, CITY ATTORNEY'S OFFICE, Austin, Texas, for Amicus City of Austin, Texas. Mark A. Flessner, Corporation Counsel, Benna Ruth Solomon, Deputy Corporation Counsel, CITY OF CHICAGO, Chicago, Illinois, for Amicus City of Chicago, Illinois. Erin K. McSherry, City Attorney, CITY ATTORNEY'S OFFICE, Santa Fe, New Mexico, for Amicus City of Santa Fe, New Mexico. Jeffrey Dana, City Solicitor, OFFICE OF THE CITY SOLICITOR, Providence, Rhode Island, for Amicus City of Providence, Rhode Island. Vince Ryan, County Attorney, Robert Hazeltine-Shedd, COUNTY ATTORNEY'S OFFICE, Houston, Texas, for Amicus County of Harris, Texas. Howard Phillip Schneiderman, Senior Deputy Prosecuting Attorney, COUNTY ATTORNEY'S OFFICE, Seattle, Washington, for Amicus County of King, Washington. Dennis J. Herrera, City Attorney, San Francisco, California, for Amicus City and County of San Francisco, California. Barbara J. Parker, City Attorney, OAKLAND CITY ATTORNEY'S OFFICE, Oakland, California, for Amicus City of Oakland, California. Michael Rankin, City Attorney, CITY ATTORNEY'S OFFICE, Tucson, Arizona, for Amicus City of Tucson, Arizona. Michael Haas, City Attorney, CITY ATTORNEY'S OFFICE, Madison, Wisconsin, for Amicus City of Madison, Wisconsin. Mary C. Wickham, County Counsel, Scott Kuhn, Assistant County Counsel, Katherine G. McKeon, Deputy County Counsel, COUNTY ATTORNEY'S OFFICE, Los Angeles, California, for Amicus County of Los Angeles, California. Nick Herman, THE BROUGH LAW FIRM, Chapel Hill, North Carolina, for Amicus Town of Carrboro, North Carolina. James E. Johnson, Corporation Counsel, CITY ATTORNEY'S OFFICE, New York, New York, for Amicus New York City, New York. Paula Boggs Muething, City Solicitor, CITY SOLICITOR'S OFFICE, Cincinnati, Ohio, for Amici City of Cincinnati. Tracy Reeve, City Attorney, CITY ATTORNEY'S OFFICE, Portland, Oregon, for Amicus City of Portland, Oregon. James R. Williams, County Counsel, OFFICE OF THE COUNTY COUNSEL, San Jose, California, for Amicus Santa Clara County, California. Marcel S. Pratt, City Solicitor, City of Philadelphia Law Department, OFFICE OF THE CITY SOLICITOR, Philadelphia, Pennsylvania, for Amicus City of Philadelphia, Pennsylvania. Francis X. Wright, Jr., City Solicitor, CITY SOLICITOR'S OFFICE, Somerville,

4

Massachusetts, for Amicus City of Somerville, Massachusetts. Crystal Barnes, Acting City Solicitor, CITY SOLICITOR'S OFFICE, Holyoke, Massachusetts, for Amici City of Holyoke, Massachusetts and Alex Morse, Mayor of Holyoke, Massachusetts. Michael Jenkins, City Attorney, BEST BEST & KRIEGER, Manhattan Beach, California, for Amicus City of West Hollywood, California. William Fosbre, City Attorney, CITY ATTORNEY'S OFFICE, Tacoma, Washington, for Amicus City of Tacoma, Washington. Zach Klein, City Attorney, Columbus, Ohio, for Amicus City of Columbus, Ohio. Charles W. Swanson, City of Knoxville Law Director, CITY ATTORNEY'S OFFICE, Knoxville, Tennessee, for Amicus City of Knoxville, Tennessee. Ronald C. Lewis, City Attorney, Judith L. Ramsey, Chief, General Litigation Section, Collyn Peddie, Senior Assistant City Attorney, Houston, Texas, for Amicus City of Houston, Texas. Jayme B. Sullivan, City Attorney, Boise, Idaho, for Amicus City of Boise, Idaho and Mayor Lauren McLean. Mark David McPherson, San Francisco, California, William C. Herbert, MORRISON & FOERSTER LLP, Los Angeles, California, for Amici International Rescue Committee, United States Conference of Catholic Bishops, World Relief, The Most Reverend Michael Bruce Currey, Presiding Bishop of the Episcopal Church, and Ethiopian Community Development Council, Inc. Steven H. Schulman, Washington, D.C., Jessica M. Weisel, Joshua D. Tate, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, for Amici Former State Department Officials.

─────────────

BARBARA MILANO KEENAN, Circuit Judge:

In 2019, President Donald Trump issued Executive Order 13,888 (the Order), which drastically alters the system by which the federal government resettles refugees across the United States.  Rather than consulting with states and localities regarding their ability to accept refugees, the Order creates an "opt-in" system requiring that both a state and a locality provide their affirmative consent before refugees will be resettled there.  Order § 2. In the funding notice (the Notice) implementing the Order, the Department of State imposed on private resettlement agencies, who provide social services for newly arrived refugees, the burden of seeking the consent of every state and locality where a refugee might be resettled.  Three of these resettlement agencies have filed suit challenging the Order and Notice, asserting that they violate the Refugee Act, 8 U.S.C. § 1522 (the Refugee Act, or the Act), principles of federalism, and the Administrative Procedure Act, 5 U.S.C. § 706(2).  The district court issued a preliminary injunction prohibiting enforcement of the Order and Notice, and the government filed this interlocutory appeal.

Upon our review, we conclude that the plaintiffs have demonstrated that they are likely to succeed on their claim that the Order and Notice violate the carefully crafted scheme for resettling refugees that Congress established in the Refugee Act.  We also conclude that the record supports the district court's award of preliminary injunctive relief under the remaining factors of *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) (the *Winter* factors).  Accordingly, we hold that the district court did not abuse its discretion in granting the preliminary injunction, and we affirm the district court's judgment.

I.

In 1980, Congress passed the Refugee Act as an amendment to the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (the INA). *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (current version codified at 8 U.S.C. § 1522). The Act establishes the refugee resettlement program, "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."[1] Pub. L. No. 96-212, § 101(b), 94 Stat. 102. The program is administered jointly by the Department of State and the Department of Health and Human Services.[2] 8 U.S.C. § 1521.

Prospective refugees seeking resettlement in the United States must obtain a determination of their refugee status before entering the country.[3] 8 U.S.C. § 1101(a)(42). Upon approval, refugees are sponsored by a private, non-profit resettlement agency, also referred to as a voluntary agency. § 1522(b)(1)(A). The Department of State contracts

---

[1] Each year, the President determines the number of refugees that will be accepted for resettlement in the United States. 8 U.S.C. § 1157(a). For fiscal year 2020, President Trump set the maximum number of refugees at 18,000.

[2] The Bureau of Population, Refugees, and Migration and the Office of Refugee Resettlement, within the two departments respectively, are responsible for administering the program.

[3] As relevant here, the INA defines "refugees" eligible for the resettlement program as persons who are "persecuted or who [have] a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The resettlement program does not apply to persons who seek asylum upon their arrival in the United States.

7

with nine of these agencies to provide resettlement services to refugees, including assistance with obtaining employment, English-language services, medical care, and housing. § 1522(a)(1), (b)(1)(A), (b)(7). Each year, resettlement agencies apply for federal funding to sponsor a defined number of refugees and propose to the Department of State a suggested distribution of those refugees to locations serviced by the agencies' local affiliates across the country. In Fiscal Year 2020, resettlement agencies received $2,175 in federal funding for each refugee sponsored.

The Refugee Act includes detailed provisions defining the relationship of the federal government, the resettlement agencies, the states, and the localities. Primarily at issue in this case is the Act's requirement that the federal government "consult regularly" with the other interested parties regarding the "sponsorship process and the [federal government's] intended distribution of refugees" around the country. § 1522(a)(2)(A). The Act requires that the federal government consult with these parties to develop policies governing the refugee resettlement program. § 1522(a)(2)(B). Congress has strengthened these consultation requirements over the years to ensure that the interests of states and localities are adequately considered before refugees are placed in their jurisdictions. *See* H.R. Rep. 99-132, at 18 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 5857, 5869.

Before the issuance of Executive Order 13,888, the federal government fulfilled its obligation to consult with states and localities by engaging in regular outreach to state and local governments and attempting to address any concerns. This outreach included officials from the Department of State and the Department of Health and Human Services traveling to those jurisdictions to evaluate state and local concerns, in order to develop a

8

comprehensive, nationwide plan for placing refugees throughout the country. The federal government addressed concerns raised by states or localities subject to the understanding that the states and localities could not reject resettlement of refugees in their jurisdictions. The resettlement agencies, in turn, conducted local refugee forums in which state and local government officials and community stakeholders participated in planning for refugee resettlement. The resettlement agencies reported the results of their outreach efforts to the federal government.

In September 2019, the provisions governing these procedures changed when the President issued Executive Order 13,888. In the Order, the President explained that "[s]ome States and localities . . . have viewed existing consultation as insufficient, and there is a need for closer coordination and a more clearly defined role for State and local governments in the refugee resettlement process." Order § 1. The President expressed the view that state and local governments were in the best position to evaluate whether they had the resources necessary for "sustainable resettlement" of refugees. *Id.* The President thus concluded that with "limited exceptions," the federal government "should resettle refugees *only* in those jurisdictions in which both the State and local governments have consented to receive refugees." *Id.* (emphasis added) (the consent requirement).

The Order directed that the Secretary of State and the Secretary of Health and Human Services create a process by which the consent of state and local governments "is taken into account to the maximum extent consistent with law." *Id.* § 2(b). Under that process, if "*either*" a state or a locality does not consent, refugees will not be resettled within the non-consenting jurisdiction

9

unless the Secretary of State concludes, following consultation with the Secretary of Health and Human Services and the Secretary of Homeland Security, that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under 8 U.S.C. [§] 1522(a)(2)(B) and (C) or other applicable law. If the Secretary of State intends to provide for the resettlement of refugees in a State or locality that has not provided consent, then the Secretary shall notify the President of such decision, along with the reasons for the decision, before proceeding.

*Id.* (emphasis added).

To implement the Order, the Department of State issued a "FY 2020 Notice of Funding Opportunity for Reception and Placement Program" in November 2019 (the Notice). The Notice provides, in relevant part:

For each state and locality where the applicant [resettlement agency] proposes to resettle refugees during the award period, the applicant should seek written consent for resettlement of refugees from the state governor's office and the chief executive officer of the local government (county or county equivalent). [The Department of State's Bureau of Population, Refugees, and Migration (PRM)] will take into account such consents to the maximum extent permitted by law, including Section 412(a) of the INA and antidiscrimination laws, in deciding where to place refugees.

The Notice later explains that resettlement agencies must "document such consents or their unavailability," and that the Department of State will not authorize placement in states or localities without such documentation. However, if these consents are not received before the date that applications are due, resettlement agencies nonetheless may submit their consent documentation on a rolling basis. The Notice does not explain how a resettlement agency could seek review by the Secretary of a jurisdiction's denial of consent.

Shortly after the Notice was issued, the plaintiffs, three resettlement agencies, filed suit against the Secretaries of State, Health and Human Services, and Homeland Security, as well as the President (collectively, the government) in federal district court in Maryland.

10

The complaint contains three claims: (1) that the Order and its implementation violate the Refugee Act, 8 U.S.C. § 1522, because refugee resettlement under the Act "may not be conditioned on either the state or the local government's approval, much less both"; (2) that the Secretaries' implementation of the Order violates the Administrative Procedure Act (APA), 5 U.S.C. § 706(2); and (3) that the Order and its implementation are unconstitutional in violation of principles of federalism.

The district court granted the plaintiffs' motion for a preliminary injunction. The court concluded that the consent requirement amounted to a veto given to states and localities over refugee resettlement within their borders. The court therefore held that the consent requirement was contrary to the Refugee Act's language, purpose, and history of imposing a uniform process for resettling refugees nationwide.[4] The court also found that the plaintiffs would suffer irreparable harm in the absence of a preliminary injunction, citing the extreme difficulties that the resettlement agencies would face. The court accordingly issued an order preliminarily enjoining nationwide the implementation of the Order and Notice. The government now appeals.

---

[4] The district court also held that the plaintiffs had raised "several valid concerns" under the APA. With respect to the plaintiffs' constitutional claim, the district court concluded that the consent requirement raised the possibility of "federal pre-emption under the Constitution." Because we conclude that the plaintiffs are likely to succeed on their statutory claim, we do not reach these additional bases for the district court's injunction.

11

II.

We review the district court's issuance of a preliminary injunction for abuse of discretion. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). A party seeking a preliminary injunction must show that: (1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest. *Id.* at 320 (citing *Winter*, 555 U.S. at 20). We will address each factor in turn.

A.

The plaintiffs assert that the Order and Notice violate the Refugee Act, by allowing states and localities to decide unilaterally whether to allow refugees to resettle in their jurisdictions. In the plaintiffs' view, by transforming the consultation process described in the Act into an "opt-in" system, the Order and Notice grant states and localities more authority over resettlement decisions than Congress intended. The plaintiffs also argue that this opt-in system results in a patchwork of resettlement locations disassociated from the priorities that Congress established in the Act.

In response, the government asserts that the Order and Notice merely implement the Act's requirement that the federal government "consult" with states and localities regarding their ability to accept refugees and give significant weight to the views of affected jurisdictions. The government contends that the Order and Notice do not require the consent of states and localities as a precondition to the resettlement of refugees, but merely call for this information to be provided as one factor that the Secretary of State (the

12

Secretary) considers when determining where individuals will be placed. In further defending the Order and Notice, the government relies heavily on the so-called "savings clause" of the Order, which grants the Secretary under limited circumstances the discretion to place refugees in a jurisdiction that has withheld consent. We disagree with the government's arguments.

We first review the Refugee Act's text and structure, giving the statutory terms their ordinary meaning. *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020); *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011). We interpret the Act's terms in the specific context in which they are used, as well as in "the broader context of the statute as a whole." *Navy Fed. Credit Union*, 972 F.3d at 357 (citation omitted); *see also Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 291 (4th Cir. 2018). When Congress has included a statement of purpose in a statute, we read the terms of the statute consistent with its expressed purpose. *Smith v. City of Jackson*, 544 U.S. 228, 257 (2005) (O'Connor, J., concurring in the judgment).

As noted above, this appeal centers on the question whether the opt-in system established by the Order and implemented by the Notice conflicts with the Act's requirement that the federal government "consult" with resettlement agencies, states, and localities (the consultation requirement). The Act includes several provisions that collectively comprise the consultation requirement. First, the Act includes an express statement of Congress' intent that in providing refugee resettlement assistance, resettlement agency "activities should be conducted in *close cooperation and advance consultation with State and local governments*." 8 U.S.C. § 1522(a)(1)(B)(iii) (emphasis

13

added).  The Act also requires that the Secretary[5] "*consult regularly* (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those states and localities."  § 1522(a)(2)(A) (emphasis added).

The Act further directs that the Secretary "develop and implement, *in consultation with representatives of voluntary agencies and State and local governments*, policies and strategies for the placement and resettlement of refugees within the United States."  § 1522(a)(2)(B) (emphasis added).  With respect to administration of the resettlement program, the Act mandates that:

> Such policies and strategies, to the extent practicable and except under such unusual circumstances as the [Secretary] may recognize, shall—
>
> > (i) [e]nsure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the [Secretary] *after consultation with such agencies and governments*) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area,
> >
> > (ii) provide for a mechanism whereby *representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival* the appropriate placement of refugees among the various States and localities . . . .

---

[5] Although the Act grants authority to the Director of the Office of Refugee Resettlement, located within the Department of Health and Human Services, the Act also authorizes the President to delegate administration of the refugee resettlement program to another federal officer.  8 U.S.C. §§ 1521, 1522(b)(1)(B).  Since 1981, the Department of State has overseen the program.  For the sake of simplicity, we will refer throughout this opinion to the Secretary of State, rather than to the Director.

14

§ 1522(a)(2)(C) (emphasis added). Thus, the Refugee Act contains three distinct provisions addressing the requirement that the federal government "consult" with states, localities, and resettlement agencies regarding the placement of refugees, as well as the stated intent of Congress that resettlement agencies work cooperatively with state and local governments.

In addition to the consultation requirement, the Refugee Act requires that policies and strategies adopted by the Secretary "take into account" enumerated factors bearing on the likelihood of successful resettlement of refugees in a particular jurisdiction. The Secretary must consider:

> (I) the proportion of refugees and comparable entrants in the population in the area,
>
> (II) the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area,
>
> (III) the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and
>
> (IV) the secondary migration of refugees to and from the area that is likely to occur.

§ 1522(a)(2)(C)(iii). Consideration of these factors helps ensure that refugees are successfully resettled in the United States and are able promptly to obtain self-sufficiency, the ultimate goal of the Act. § 1522(a)(1)(A)–(B).

With this statutory framework in mind, we first focus on the ordinary meaning of the requirement that the Secretary "consult" with resettlement agencies, localities, and states. The ordinary meaning of the term "consult" is to seek an opinion or advice, or to

15

deliberate. *Consult*, Webster's Third New International Dictionary, Unabridged (2020).

Notably, by imposing only a "consultation" requirement, Congress chose not to require the "approval" or "consent" of the states and localities. Nor did Congress include any other language in the Act suggesting that the opinions of states and localities should be given dispositive weight in resettlement decisions. To the contrary, the Act clarifies in its statement of purpose that resettlement agencies should work "in close cooperation and advance consultation with State and local governments." § 1522(a)(1)(B)(iii).[6] Use of the term "cooperation" together with the term "consultation" strongly suggests that Congress intended for the consultation requirement to involve a dialogue facilitating an exchange of opinions among the affected parties.

The terms of the Order, however, do not require states and localities, before withholding consent, to engage in *any* deliberation with other interested parties. Thus, on its face, the consent requirement in the Order is inconsistent with the ordinary meaning of the term "consultation" as expressed in the Act.

Moreover, our interpretation of the terms "consult" and "consultation" is consistent with the broader context of the Refugee Act, which describes in detail the nature of the relationship of the federal government, the resettlement agencies, and the states and localities in making initial resettlement decisions. Enacted by Congress in 1980, the Act was designed "to provide *comprehensive and uniform provisions* for the effective

---

[6] In amending the Act in 1986, Congress explained that the consultation requirement is "not intended to give States and localities *any veto power over refugee placement decisions*, but rather to ensure their input into the process and to improve their resettlement planning capacity." *See* H.R. Rep. 99-132, at 19 (emphasis added).

resettlement and absorption" of refugees. Pub. L. No. 96-212, § 101, 94 Stat. 102 (emphasis added). The Act thus places ultimate decision-making authority in the Secretary, by empowering her to make refugee resettlement determinations based on her assessment of the resources available to refugees in jurisdictions across the country. *See* 8 U.S.C. § 1522(a)(3) ("[T]he [Secretary] shall make a periodic assessment, based on refugee population and other relevant factors, of the relative needs of refugees for assistance and services under this subchapter and the resources available to meet such needs."); § 1522(a)(2)(B) ("*The [Secretary] shall develop and implement*, [in consultation with resettlement agencies, states, and localities], policies and strategies for the placement and resettlement of refugees within the United States." (emphasis added)). The consultation requirement enables the Secretary to discern whether states and localities can resettle refugees successfully according to the factors enumerated in the statute. *See* § 1522(a)(2)(C)(iii) (listing factors that the Secretary's policies must "take into account").

In contrast, the Order's opt-in procedure shifts the decision-making center of gravity from the federal government to states and localities. Without the Act's required dialogue *before* jurisdictions grant or withhold consent, the Secretary cannot timely evaluate what resources states and localities could devote to refugee resettlement or whether a particular jurisdiction might be suitable for resettlement.[7] Thus, the Order's consent requirement

---

[7] This problem persists irrespective of the Notice's statement that before seeking federal funding, local resettlement agency affiliates "*will have consulted* with state governors' offices, state refugee coordinators, local governments, and resettlement partners in their communities *in order to seek the consents of state and local governments* and ensure that the placement plans and sites are reasonable and appropriate" (emphasis added). (Continued)

17

does not implement, but effectively overrides, the Act's directive that resettlement decisions be made by the Secretary based on an exchange of information among all interested parties.[8]

Nor does the Order require that states and localities base their consent decisions on the resettlement criteria specified in the Refugee Act, namely, (1) the population of refugees already in the area, (2) the availability of employment, housing, and other resources in the area, (3) the likelihood that refugees placed in the area will become self-sufficient, and (4) the likelihood of secondary migration to and from the jurisdiction in question (the statutory criteria, or the enumerated factors). § 1522(a)(2)(C)(iii). To the contrary, states and localities may withhold consent for any reason or for no reason at all,[9] and need not provide any explanation for their decision. Accordingly, by replacing the flexible consultation process with an opt-in system, the Order effectively supplants the statutory criteria that Congress chose to guide resettlement decisions made at the federal level.

---

As discussed below, this provision does nothing more than impose on resettlement agencies the obligation to lobby local and state governments to obtain their consent.

[8] To the extent the government suggests that it will continue to consult with states and localities irrespective of the jurisdictions' consent, such an assertion strains credulity. The intent of the Order is patently clear, namely, to avoid settling refugees in non-consenting jurisdictions. We thus fail to see how or why the government would engage in a dialogue with jurisdictions where refugees will not be resettled.

[9] The Notice clarifies that state and local consent "may not be conditioned on acceptance of certain refugees or on any other factor, such as refugees' race, ethnicity, religion, or national origin."

As a result, a locality could be well-suited to receive refugees under the statutory criteria, but nevertheless decline to opt-in to the resettlement program. Such a decision withholding consent would be entirely divorced from the resettlement criteria set forth by Congress in the statute. Conversely, a local jurisdiction could determine that it was able to accept refugees according to the statutory factors yet be impeded from receiving refugees if the state decided to withhold its consent. Again, the state's decision in contravention of the locality's wishes could be based on reasons entirely unrelated to the criteria set forth in the Act. This license to ignore the statutory criteria plainly is at odds with the careful sequencing process established by Congress.

Such potential disregard of the statutory criteria by states and localities is not a mere technicality but could undermine substantially the national resettlement program created by Congress. For example, the Act requires that the Secretary consider the likelihood of secondary migration, which occurs when refugees relocate elsewhere from their original placement, usually to be closer to family or friends. § 1522(a)(2)(C)(iii)(IV). Secondary migration has a negative impact on the government-based resources available to the relocated refugees, as well as on resettlement agency affiliates in both the original and destination jurisdictions whose funding has not been allocated properly. The affiliate in the original jurisdiction loses its initial investment in the refugee's housing and other services, and the affiliate in the destination jurisdiction may not receive federal funding to aid in the refugee's resettlement. Recognizing this problem, Congress expressly directed that the Secretary consider the possibility of secondary migration in determining whether

19

resettlement is appropriate in each jurisdiction. § 1522(a)(2)(C)(iii)(IV). Thus, prior to the Order, refugees often were placed in localities close to family and friends.

The Order undermines this statutory priority of avoiding secondary migration by creating a random patchwork of jurisdictions that have agreed to accept refugees. Thus, if a locality with a significant refugee population from Country A withholds consent, family members who were placed elsewhere may move from their original placement to live near loved ones or other refugees from Country A in the non-consenting jurisdiction. Secondary migration therefore is likely to occur irrespective of the jurisdiction's failure to consent to the refugee's resettlement. Such resettlement migration in disregard of the statutory criteria will place increased stress on the non-consenting jurisdiction's resettlement infrastructure that otherwise could have been avoided.

In addition to shifting significant decision-making authority away from the Secretary, the Order also conflicts with the Refugee Act's allocation of responsibility between states and localities. Section 1522(a)(2)(D) of the Act provides:

> With respect to the *location of placement of refugees within a State*, the Federal agency administering subsection (b)(1) shall, consistent with such policies and strategies and to the maximum extent possible, *take into account recommendations of the State* (emphasis added).

This provision gives states a significant voice in the Secretary's determination of which jurisdictions within each state are best equipped to accept refugees.

Notably, the provision omits any reference whatsoever to localities, indicating Congress' intent to prioritize the recommendation of a state over its localities regarding the

20

distribution of refugees within the state.[10]   This prioritization is consistent with fundamental principles of state sovereignty, under which localities are political subdivisions of their states and possess only the authority granted to them by their state governments. *See Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991) ("[L]ocal governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." (citation, internal quotation marks, and alterations omitted)); *Reynolds v. Sims*, 377 U.S. 533, 575 (1964) (cities and counties are political subdivisions of the states, and are "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions" at the discretion of the state).

The Order, however, creates impermissible power shifts between states and their localities, by purportedly enabling a locality to withhold consent and to override the state's decision to accept refugees.  Again, this problem is not merely theoretical.  At least three localities within consenting states already have acted in an attempt to withhold consent to refugee resettlement.  As noted above, the Order's purported grant of such decision-making authority to local jurisdictions is at odds with the limited authority granted to localities by their states, and with the Act's mandate that the views of *the state* will be "take[n] into

---

[10] We reject the government's assertion that the consent requirement is supported by the requirement of Section 1522(a)(2)(D) that the federal government consider a state's views "to the maximum extent possible."  By its plain terms, that provision applies to the placement of refugees *within the state's borders*, not to whether refugees will be resettled in the state at all.

21

account" "to the maximum extent possible" regarding which localities will receive refugees. § 1522(a)(2)(D).

The Notice also presumes, without justification, that executive officers of localities possess authority to make such a consent determination. The Notice requires written consent from the "chief executive officer of the local government (county or county equivalent)." However, in the unlikely event that a state granted its localities the authority to make such a decision withholding consent, that decision likely would rest with the localities' legislative, rather than executive, branch of government. *See* 1 John Martinez, Local Government Law § 9:8 (Oct. 2020 update) ("Powers or functions conferred without limitation on local government entities are deemed to be exercisable by the entity's legislative body and by no other authority."). Thus, with its disordered shifts in governmental power, the Order and Notice thrust the resettlement agencies into the middle of a process that will place states and their localities in conflict with each other and with the resettlement agencies themselves. This outcome plainly is at odds with the Act's goal of establishing a cooperative and collaborative relationship among states, localities, the federal government, and resettlement agencies.

Finally, the Notice is inconsistent with Congress' express purpose regarding resettlement agencies' allocation of resources. The Act states, in relevant part, that "[i]t is the intent of Congress that in providing refugee assistance under this section . . . social service funds should be focused on employment-related services, English-as-a-second-language training (in nonwork hours where possible), and case-management services . . . ."

§ 1522(a)(1)(B)(ii). In contravention of this statutory purpose, the Notice re-focuses resettlement agencies' funds *away* from education, employment, and other services.

Under the Notice, resettlement agencies face the onerous task of seeking consent from every state and locality where refugees might be placed. Put differently, the Notice radically transforms the resettlement agencies' focus by imposing on them the extreme burden of lobbying the many states and localities to obtain their consent before refugees will be placed in those jurisdictions. The record is clear that the resettlement agencies were not designed for this role and have been forced to divert enormous resources from their core social service missions to their new lobbying responsibilities. And, if a state or locality declines to grant consent, local affiliates of the resettlement agencies will be unable to settle refugees in those jurisdictions and will lose their federal funding, resulting in great harm to the refugee resettlement infrastructure that has developed nationwide under the Act's umbrella.

Our conclusion regarding the many infirmities of the consent requirement is not altered by the government's reliance on the so-called "savings clause" of the Order, which provides:

> [I]f either a State or locality has not provided consent to receive refugees under the Program, then refugees should not be resettled within that State or locality *unless the Secretary of State concludes*, following consultation with the Secretary of Health and Human Services and the Secretary of Homeland Security, *that failing to resettle refugees within that State or locality would be inconsistent with the policies and strategies established under 8 U.S.C. [§] 1522(a)(2)(B) and (C) or other applicable law*. If the Secretary of State intends to provide for the resettlement of refugees in a State or locality that has not provided consent, then the Secretary shall notify the President of such decision, along with the reasons for the decision, before proceeding.

23

Order § 2(b) (emphasis added).

While the savings clause offers a theoretical opportunity for the Secretary to override the consent requirement, the exception stated in the savings clause is merely that – theoretical. Neither the Order nor the Notice provide any mechanism whatsoever for resettlement agencies, states, or localities to seek an exception to the consent requirement. Contrary to the government's assertion, it is patently clear from the Notice that a resettlement agency's application will not be considered if a proposed state or locality has refused to consent to refugee resettlement within its borders.

Nor has the government explained any standards the Secretary would use to evaluate whether "failing to resettle refugees within [a non-consenting] State or locality would be *inconsistent with* the policies and strategies" of the Act. Order § 2(b) (emphasis added). Nothing in the Act requires that refugees be resettled in a jurisdiction with the most available resources relative to other locations. And given the many factors relevant to a resettlement decision, it is not clear how a resettlement agency could prove that the inability to resettle a refugee in any particular jurisdiction would be "inconsistent" with the Act. Accordingly, without a procedure for invoking the savings clause or any standards for applying it, we cannot conclude that the clause "saves" the Order from the infirmities described above.

More fundamentally, however, we reject the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the "clear and specific" substantive provisions of the Order. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). The intent of the Order is clear. With "limited exceptions,"

24

refugees as a rule will be resettled "only in those jurisdictions in which both" the state and the locality have consented to receive them.  Order §§ 1-2.  Given the Order's stated goal of limiting resettlement to consenting jurisdictions, the savings clause "does not and cannot override [the Order's] meaning."[11]  *City & Cnty. of S.F.*, 897 F.3d at 1240.  We thus agree with the Ninth Circuit's view that if a savings clause "precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise."  *Id.*  Therefore, we decline to adopt the government's position that effectively would nullify judicial review of the Order's substance.  Here, the Order includes a purely theoretical savings clause, with no method or standard for invoking it, the application of which would undermine the consent requirement itself.  The President cannot immunize his Order from scrutiny under such conditions.

At bottom, the consent requirement in the Order and Notice is "incompatible with the overall statutory scheme governing" the refugee resettlement program.  *Kouambo v. Barr*, 943 F.3d 205, 213 (4th Cir. 2019).  We therefore conclude that the plaintiffs are likely to succeed on the merits of their statutory claim.

### B.

We turn to consider the remaining *Winter* factors, namely, whether the plaintiffs are likely to suffer irreparable harm in the absence of an injunction, whether the balance of

---

[11] We disagree with the government's assertion at oral argument that the consent of the states and localities is just one factor the Secretary would consider when making resettlement decisions.  That position is belied by the text of the Order, which plainly establishes an opt-in system, and requires the Secretary to defer to a jurisdiction's withholding of consent "to the maximum extent consistent with law."  Order § 2(b).

hardships weighs in their favor, and whether an injunction serves the public interest. *Pashby*, 709 F.3d at 320. We conclude that all three factors support the district court's issuance of a preliminary injunction.

Although the government characterizes the harm that the plaintiffs allege as mere "administrative inconvenience," the record establishes that the Order and Notice will cause much more significant and irreparable injuries. As described above, the burden of obtaining consent from every state and local government is an onerous one, requiring diversion of resources away from the resettlement agencies' core missions. More consequentially, however, the plaintiffs likely will be unable to sponsor refugees in non-consenting jurisdictions. In the absence of federal funding for these refugees, local affiliates of the plaintiffs in non-consenting jurisdictions likely will have to cease their resettlement work. And, even if those local affiliates survive, the community connections they have developed are likely to erode in non-consenting jurisdictions where refugees no longer will be placed. These injuries would be significant and irreparable in the absence of an injunction.

We also agree with the district court that the balance of hardships favors the plaintiffs. The resettlement agencies face enormous burdens to comply with the Order and Notice, as well as the likelihood of affiliates closing entirely in jurisdictions that refuse consent. In contrast, under the district court's injunction, the government must continue to implement the refugee resettlement program according to the Act's well-established processes refined over several decades. These procedures include the federal government's robust consultation with states, localities, and resettlement agencies as required by the Act.

26

Given the risk of serious consequences should the Order and Notice take effect, we similarly conclude that the public interest is served by maintaining the status quo during the pendency of this litigation.

For these reasons, we hold that the district court did not abuse its discretion in issuing a preliminary injunction against implementation of the Order and Notice.

C.

Finally, the government argues that the district court abused its discretion in issuing a nationwide injunction that encompasses the six non-party resettlement agencies as well as the plaintiffs. The government argues that the injunction is overbroad, because these non-party resettlement agencies could have, but did not, challenge the Order and Notice. We disagree with the government's position.

District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Id.* (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232-33.

27

We conclude that the district court did not abuse its discretion in issuing a nationwide injunction. The refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country. Enjoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect.

## III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*